CASE NO. 24-10047


IN THE UNITED STATES COURT OF APPEALS FOR THE
ELEVENTH CIRCUIT

LOWER TRIBUNAL CASE NO. 22-cr-20152


**UNITED STATES OF AMERICA**,

Plaintiff/Appellee,

-vs-

**ELIZABETH HERNANDEZ**

Defendant/Appellant.

---

**AMENDED INITIAL BRIEF OF APPELLANT**

---

---

APPEAL FROM THE SOUTHERN DISTRICT OF FLORIDA

---

Daniel Tibbitt
Law Offices of Daniel J. Tibbitt, P.A.
1175 NE 125th Street, Suite 404
North Miami, FL 33161
(305) 384-6160
dan@tibbittlaw.com
Florida Bar No. 816361

Counsel for Appellant

**CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS**

Altonaga, Alyssa—attorney for Defendant

Argentieri, Nicole M.—Assistant Attorney General

Becerra, The Hon. Jacqueline—Magistrate Judge

Carames, Dianne—attorney for Defendant

Centers for Medicare and Medicaid Services—alleged victim

Charest-Turken, Gabrielle—Assistant United States Attorney

Coley, Timothy—Department of Justice

Fernandez, Hon. Ivan—Florida District Court Judge

Fleischer Louis, The Hon. Lauren—Magistrate Judge

Gonzalez, Juan Antonio—Acting United States Attorney

Gurskis, Emily—Department of Justice

Hernandez, Elizabeth—Defendant/Appellant

Lapointe, Markenzy—United States Attorney

Litwin, Ashley—attorney for Defendant

Matzin, Daniel—Assistant United States Attorney

McAliley, The Hon. Chris—Magistrate Judge

McCabe, The Hon. Ryon—Magistrate Judge

McDougan, Andrew—United States Probation

Miller, Lisa H.—Assistant Attorney General

Moore, the Hon. K. Michael—District Judge

Moss Jr., Reginald (Tony)—attorney for Defendant

Nahra, Annabelle—attorney for Defendant

Otazo-Reyes, The Hon. Alicia—Magistrate Judge

Payerle, Katherine—Department of Justice

Sanders, Jeremy R.—Assistant Attorney General

Savdie, Andrea—Department of Justice

Scanlon, John—Department of Justice

Seitles, Marc—attorney for Defendant

Tibbitt, Daniel—attorney for Defendant

Tischler, Dustin—attorney for Defendant

Torres, the Hon. Edwin—Magistrate Judge

United States of America—alleged victim

Villar, Yisel—attorney for Defendant

Vora-Puglisi, Sabrina—attorney for Defendant

Undersigned counsel certifies that to my knowledge no publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

The appellant is requesting oral argument in this matter as we believe the record is complex and oral argument would assist the Court in deciding this case, which involves a mother with no prior criminal history who is sentenced to serve 20 years in prison for allegedly being a lower-level participant in a healthcare fraud scheme. Multiple legal and factual issues are in dispute and appellant believes oral argument would assist the Court in deciding this case.

# TABLE OF CONTENTS

**DOCUMENT**                                                                    **PAGE**

CORPORATE DISCLOSURE STATEMENT AND
STATEMENT OF INTERESTED PERSONS ................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

TABLE OF CONTENTS ........................................................................... v

TABLE OF CITATIONS ........................................................................ vii

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 2

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ..................................................................... 3

STANDARD OF REVIEW ........................................................................ 28

SUMMARY OF THE ARGUMENT ............................................................ 29

ARGUMENT .......................................................................................... 30

    I.     The District Court Reversibly Erred in Limiting the Defense's
Closing to Thirty Minutes When the Government Received Forty
Minutes, 33 Percent More Time ........................................................ 30

    II.    The District Court Reversibly Erred in Instructing the Jury That
the Defense Had the Burden of Proving Good Faith ........................ 36

    III.   The District Court Reversibly Erred In Denying a Cause Challenge
on Juror Mikels ............................................................................... 39

IV. **The District Court Reversibly Erred in Interjecting Itself Into a Dispute Over What Context the Jury Would Be Given Regarding an Inculpatory Prior Statement by Ms. Hernandez, and Thereby Departing from the Principle of Neutrality and Violating the Rule of Completeness** ....................................................................43

V. **The District Court Reversibly Erred in Sentencing Ms. Hernandez Based on Intended Rather than Actual Loss Amount** ......................47

**CONCLUSION** .........................................................................................51

**CERTIFICATE OF COMPLIANCE** .......................................................52

**CERTIFICATE OF SERVICE** ...............................................................52

## TABLE OF CITATIONS

**CASES**                                                                 **PAGE(S)**

*Barrett v. Holmes*,
102 U.S. 651 (1880) ..................................................................................42

*Batson v. Kentucky*,
476 U.S. 79 (1986) ...................................................................................41

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988) ..................................................................................45

*Berkovitz v. United States*,
213 F.2d 468 (5th Cir. 1954) ....................................................................38

*Fennell v. Sec'y, Fla. Dep't of Corr.*,
582 Fed. Appx. 828 (11th Cir. 2014) ........................................................39

*Gall v. United States*,
552 U.S. 38 (2007) ...................................................................................50

*Hawkins v. Barney's Lessee*,
30 U.S. 457 (1831) ...................................................................................42

*Kisor v. Wilkie*,
139 S.Ct. 2400 (2019) ..............................................................................48

*Mann v. United States*,
319 F.2d 404 (5th Cir. 1963) ........................................................... 37, 38

*Marshall v. Jerrico, Inc.*,
446 U.S. 238 (1980) ..................................................................................44

*People v. Lopez*,
974 N.E.2d 291 (Ill. 1st Dist. 2012) .........................................................32

*Ross v. Oklahoma*,
487 U.S. 81 (1988) ...................................................................................39

***Spivey v. Head***,
207 F.3d 1263 (11th Cir. 2000) ...................................................................40

***Stinson v. United States***,
508 U.S. 36 (1993) ...................................................................................48

***Swain v. Alabama***,
380 U.S. 202 (1965) .................................................................................41

***United States v. Banks***,
55 F.4th 246 (3rd Cir. 2022) .....................................................................49

***United States v. Bordeaux***,
108 F.4th 702 (8th Cir. 2024) ...................................................................50

***United States v. Boston***,
194 Fed. Appx. 890 (11th Cir. 2006) ................................................... 28, 33

***United States v. Butler-Jackson***,
20-14843, 2022 U.S. App LEXIS 299, 2022 WL 41278
(11th Cir. Jan. 5, 2022) ............................................................................49

***United States v. Caldwell***,
81 F.4th 1160 (11th Cir. 2023) .................................................................29

***United States v. Chandler***,
996 F.2d 1073 (11th Cir. 1993) ................................................................39

***United States v. Chiantese***,
560 F.2d 1244 (5th Cir. 1977) ..................................................................38

***United States v. Collins***,
437 Fed. Appx. 760 (11th Cir. 2011) .........................................................40

***United States v. Davis***,
854 F.3d 1276 (11th Cir. 2017) ................................................................41

***United States v. Dupree***,
57 F.4th 1269 (11th Cir. 2023) .................................................................48

***United States v. Gomez-Jimenez*,**
750 F.3d 370 (4th Cir. 2014) ......................................................................50

***United States v. Hill*,**
643 F.3d 807 (11th Cir. 2011) .....................................................................33

***United States v. Hillard*,**
752 F.3d 578 (11th Cir. 1985) .....................................................................33

***United States v. Hyde*,**
22-10322, 2024 U.S. App LEXIS 4107, 2024 WL 726909
(11th Cir. Feb. 22, 2024) ..................................................................... 28, 37

***United States v. Keene*,**
470 F.3d 1347 (11th Cir. 2006) ...................................................................49

***United States v. Lance*,**
853 F.2d 1177 (5th Cir. 1988) .....................................................................44

***United States v. Martinez-Salazar*,**
528 U.S. 304 (2000) ....................................................................................40

***United States v. Miles*,**
10 F.3d 1135 (5th Cir. 1993) .......................................................................46

***United States v. Montor-Torres*,**
449 Fed. Appx. 820 (11th Cir. 2011) ..........................................................33

***United States v. Patel*,**
19-cr-80181, 2023 U.S. Dist. LEXIS 148507, 2023 WL 5453747
(S.D. Fla. Aug. 23, 2023) ..................................................................... 48

***United States v. Quinones-Chavez*,**
641 Fed. Appx. 722 (9th Cir. 2016) .............................................................45

***United States v. Raymundi-Hernandez*,**
984 F.3d 127 (1st Cir. 2020) .......................................................................46

***United States v. Rhodes***,
177 F.3d 963 (11th Cir. 1999) ...................................................................29

***United States v. Russell***,
703 F.2d 1243 (11th Cir. 1983) .................................................................37

***United States v. Siegelman***,
786 F.3d 1322 (11th Cir. 2015) .................................................................29

***United States v. Thayer***,
204 F.3d 1352 (11th Cir. 2000) .................................................................33

***United States v. Velasco***,
953 F.2d 1467 (7th Cir. 1992) ...................................................................44

***United States v. Williams***,
930 F.3d 44 (2nd Cir. 2019) ......................................................................45

***United States v. Wright***,
392 F.3d 1269 (11th Cir. 2004) .................................................................46

***United States v. Young***,
Cr-09-140-B-W, 2010 U.S. Dist. LEXIS 35494, 2010 WL 14614574
(D. Me. Apr. 9, 2010) ..................................................................................45

## OTHER AUTHORITIES

11th Circuit Standard Jury Instructions S17 ...............................................37

The Ordinance on Inquests, 33 Edw. 1, Stat. 4 (1305) ...............................41

## RULES

Fed. R. Evid. 106..................................................................................44, 46

## SENTENCING GUIDELINES

§ 2B1.1 ...................................................................................................... 47, 48

## STATUTES

18 U.S.C. § 1035 ............................................................................................... 3

18 U.S.C. § 1347 ............................................................................................... 3

18 U.S.C. § 1349 ............................................................................................... 3

18 U.S.C. § 3231 ............................................................................................... 2

28 U.S.C. § 1291 ...............................................................................................2

28 U.S.C. § 3742 ...............................................................................................2

CASE NO. 24-10047

IN THE UNTED STATES COURT OF APPEALS FOR THE
ELEVENTH CIRCUIT

LOWER TRIBUNAL CASE NO. 22-cr-20152

**UNITED STATES OF AMERICA,**

Plaintiff/Appellee,

-vs-

**ELIZABETH HERNANDEZ**

Defendant/Appellant.

---

**AMENDED INITIAL BRIEF OF APPELLANT**

---

APPEAL FROM THE SOUTHERN DISTRICT OF FLORIDA

---

## INTRODUCTION

This is the direct appeal of a judgment of guilt and sentence of 240 months
(20 years) in federal prison, imposed after a jury trial and guilty verdict as to multiple
health care fraud related charges.

# JURISDICTIONAL STATEMENT

The appellant was charged with violations of federal law that were within the jurisdiction of the district court pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The Notice of Appeal was filed timely.

# STATEMENT OF THE ISSUES

1. Whether the district court erred in giving the Government 33 percent more time for closing argument than the defense and cutting off the defense mid-argument, where the defense articulated prejudice.

2. Whether the district court committed plain error by giving an instruction that shifted the burden of proof to the defendant on the central issue, good faith.

3. Whether the district court erred in denying a cause challenge on a juror who acknowledged they should not sit because of preexisting views on Medicare fraud.

4. Whether the district court erred by inserting itself into a dispute over the context the jury would hear regarding Ms. Hernandez's inculpatory written statement, resulting in the jury not hearing exculpatory context for that statement which the parties had agreed they would hear.

5. Whether the district court erred in sentencing Ms. Hernandez based on using

intended rather than actual loss to calculate the sentencing guidelines.

## STATEMENT OF THE CASE

<u>Course of the Proceedings.</u>

Elizabeth Hernandez is currently incarcerated and serving a 240-month prison sentence imposed at a contested sentencing hearing after she was convicted at trial.

<u>Statement of the Facts.</u>

*Indictment*

Elizabeth Hernandez was charged by indictment (D.E. 3) with one count of conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), six counts of health care fraud (18 U.S.C. § 1347), and three counts of false statements relating to health care matters (18 U.S.C. § 1035). The indictment alleged she conspired to execute a scheme to defraud Medicare by making false statements with the purpose of getting kickbacks and bribes for fraudulent Medicare claims for medically unnecessary Durable Medical Equipment (DME) prescriptions and genetic tests, and by making false Medicare claims for telemedicine consultations that were not necessary, not reimbursable, or not done. (D.E. 3 pp. 8-9).

*Voir Dire*

During voir dire, Juror Mikels demonstrated an inability to be fair and

impartial in a case involving Medicare fraud.  He said "...I have been paying into the system for 50 years, and for someone who comes along and trying to nefariously bilk the system doesn't sit well with me." (D.E. 143 p. 153).  The defense asked Juror Mikels to expand on that and he said "Well, you hear all the time about millions of dollars in Medicare fraud, and if you don't—if you don't deserve it, you shouldn't get it.  You shouldn't mis-bill or cheat government or people like me that have been paying for, like, 50 years." (D.E. 143 p. 153).  The defense asked him if, knowing this was a Medicare fraud case, he could be fair and impartial. (D.E. 143 p. 153-154).  Juror Mikels said "I don't know any particulars about this case.  But, in general, it kind of rubs me the wrong way when people steal from the system." (D.E. 143 p. 154).  The following dialogue then occurred:

> MS. PUGLISI [Defense counsel]:  And I appreciate that.  But, knowing that you have heard no evidence in this case, can you be fair and impartial, or is this one that you think maybe you should sit out?"
> PROSPECTIVE JUROR [Mikels]: Probably.
> MS. PUGLISI:  Probably which one?
> PROSPECTIVE JUROR:  Stay out.
> MS. PUGLISI:  All right.

(D.E. 143 p. 154).  In selection when it came time to address Mr. Mikels (juror 21) the defense moved for a cause challenge.  The judge said "I remember your questioning and his answers that he would, in fact, decide this case on this evidence. I will deny the defense motion." (D.E. 143 p. 167).  The defense said "the very last thing he said, I went back to him to say, okay.  But, knowing this, do you think you—

this is one you should sit out?  And he said yes.  So, I just want to be clear that his last statement was not that he could be fair and impartial." (D.E. 143 p. 167).  The Court still denied the cause challenge and the defense exercised a peremptory challenge. (D.E. 143 pp. 167-68).  The defense ultimately exhausted its peremptory challenges and attempted to peremptorily strike juror 32 and was denied. (D.E. 143 pp. 172-73).  The defense then requested an additional peremptory "based on the Court's denial of my request for cause challenge against Juror No. 21, Mr. Mikels, based upon reasonable doubt whether he could be fair and impartial". (D.E. 143 p. 173).  The Court said it did not think it could grant extra peremptories, and did not. (D.E. 143 p. 174).  Thus, Juror 32, whom the defense attempted to strike, sat on the jury. (D.E. 143 p. 185).  The defense renewed their objection to the denial of the additional peremptory before the jury was sworn. (D.E. 143 p. 186).

*Trial.*

The government first called Stephen Quindoza. (D.E. 144 p. 37).  He worked for a private company that contracts with the government to investigate Medicare fraud. (D.E. 144 p. 38).  He testified that Ms. Hernandez prescribed a high volume of DME braces and genetic tests. (D.E. 144 pp. 49-73).  The DME and genetic tests were not billed to Medicare by Ms. Hernandez, but by the laboratory (for the tests) or supplier (for the DME) (D.E. 144 p. 75).  Mr. Quindoza said that the level of complexity that was billed for visits by Ms. Hernandez was not consistent with

simply electronically signing a pre-filled genetic test order. (D.E. 144 p. 77).  He also said that a prescriber is not allowed to have someone else sign the Medicare billing documents for them. (D.E. 144 pp. 77-78).  Mr. Quindoza analyzed the billing for visits, which he said would have amounted to billing for over 24 hours a day on 80 days. (D.E. 144 p. 83).  He acknowledged that billing is not precise as to time and there is some wiggle room as to how long a moderate or complex visit with a provider will take. (D.E. 144 p. 84).  Mr. Quindoza said that these time calculations were based on him assuming the visits were 45 minutes and would have been very different if they were, for instance, 5 minutes. (D.E. 144 p. 124).

Mr. Quindoza never talked to Ms. Hernandez, never talked to her patients, never reviewed any medical charts or claims, and did not have any knowledge of  if the prescriptions at issue were medically necessary. (D.E. 144 pp. 104-05).  He did not know whether Ms. Hernandez was the one who actually placed the DME and genetic testing orders, only that her NPI number was used to place those orders. (D.E. 144 p. 108).  He also did not know if the patients received the benefits from the prescriptions Medicare paid for. (D.E. 144 p. 113).  Mr. Quindoza agreed billing errors are common and it is normal for prescribers to use a biller for their Medicare claims. (D.E. 144 pp. 111-16).

Mr. Quindoza said during Covid Medicare expanded coverage for telehealth visits, including allowing them for new patients. (D.E. 144 pp. 118-21).  E-visits, or "communication between a patient and a provider through an online patient portal",

6

was permitted. (D.E. 144 p. 119). He also confirmed Medicare would pay for genetic testing for "any cancer diagnosis". (D.E. 144 p. 123).

Although Mr. Quindoza initially said the person prescribing must be the person who does the physical examination on the patient, he was shown a Medicare Program Integrity Manual which said the person who conducts the face-to-face evaluation does not have to be the prescriber, and the prescriber could rely on another person's examination of the patient, and agreed that is correct. (D.E. 144 pp. 139-41).

The government called Joanna Ledesma. (D.E. 144 p. 148). Ms. Ledesma had been close with Ms. Hernandez and had attended nursing school with her. (D.E. 144 p. 150). In early 2019 Ms. Ledesma started working with Ms. Hernandez, initially unpaid, trying to help her chart for patients by putting information into the place it needed to go in electronic forms. (D.E. 144 p. 152-53). Ms. Ledesma said Ms. Hernandez instructed her to put Ms. Hernandez's signature on the charts of patients Ms. Hernandez had already called. (D.E. 144 p. 153). Ms. Ledesma said that sometimes Ms. Hernandez asked her to make up information to put in patient charts. (D.E. 144 p. 161). Ms. Ledesma said when she called patients she would confirm their name and demographic information, and confirm what braces they needed, but was not doing medical consultations where she would ask about symptoms or perform diagnosis. (D.E. 144 p. 169).

Ms. Ledesma also described genetic testing and opening the patient charts

and adding ICD-10's or codes, saying it was "very fast" and she would open, click, sign, and download a PDF. (D.E. 144 pp. 172-73). Shown a genetic testing order, Ms. Ledesma said the information about the patient's cardiac conditions and family history was already there when she received that form. (D.E. 144 p. 174). Other than what was on the form, neither Ms. Ledesma nor Ms. Hernandez had additional information about the patient. (D.E. 144 p. 175). One of the clicks on the form would electronically sign Ms. Hernandez's name. (D.E. 144 p. 176). Ms. Ledesma said she never signed for Ms. Hernandez without Ms. Hernandez's consent. (D.E. 144 p. 176).

Ms. Ledesma also said that they did not have an ongoing relationship with patients, she personally did not use the results of the genetic testing to manage patients' condition, and she personally did not maintain SOAP (Subjective Objective Assessment and Plan) notes for the patients. (D.E. 144 pp. 196-97). A text message was introduced where Ms. Hernandez told Ms. Ledesma "just fake it", referring to a call log that was used in internal memos. (D.E. 144 p. 225, 145 p. 41). There were also text messages the two exchanged ideas about signing Ms. Hernandez's name, which Ms. Ledesma joked she could not do because it was too difficult. (D.E. 144 pp. 226-27).

Ms. Ledesma said on October 23, 2020, Ms. Hernandez called her and told her the FBI had accused her of lying to them, and asked for help remembering details about the process they used with DMERX. (D.E. 144 p. 247). Ms. Ledesma went to see Ms. Hernandez and testified that Ms. Hernandez told her she was scared and

started deleting some messages. (D.E. 144 pp. 250-51). Ms. Hernandez did not tell Ms. Ledesma to delete her text messages, and she did not, which is how the government got them. (D.E. 144 p. 251, 145 p. 28).

Ms. Ledesma was a registered nurse with over a decade of experience in the medical field. (D.E. 144 p. 271). She had experience in completing charts, a common nursing task. (D.E. 144 p. 272). She would complete charts and leave them pending so Ms. Hernandez could later review them, complete the job, and sign them. (D.E. 144 pp. 272-73). Ms. Ledesma testified when working on charts Ms. Hernandez was always present or available by Facetime, text, or phone. (D.E. 144 pp. 274-75).

When Ms. Ledesma called patients, they were real people who had real medical problems necessitating DME or genetic testing. (D.E. 144 pp. 278-79). For patients she did not call, she did not know if someone else had already called them and that is why Ms. Hernandez told her not to call. (D.E. 144 p. 281). When she received the forms the patient information was already there, and Ms. Hernandez told her there were coordinators who worked for the companies they were contracting with who put that information in. (D.E. 144 pp. 281-83). She did not know if the coordinators were medical professionals. (D.E. 144 p. 282). If Ms. Ledesma spoke to a patient who wanted a different brace than what was on the form, Ms. Hernandez told Ms. Ledesma to give them the brace they wanted. (D.E. 144 p. 284). If the patient did not want a brace, they would not prescribe one. (D.E. 144 pp. 285-86). Ms. Hernandez told Ms. Ledesma to never order more than three braces

9

for a patient. (D.E. 144 p. 284). Both Ms. Hernandez and Ms. Ledesma called patients to give them genetic testing results. (D.E. 144 pp. 241-42).

Ms. Ledesma did not think they were committing Medicare fraud, and when she talked to patients regarding the genetic testing they were generally excited and confirmed they wanted the test. (D.E. 145 pp. 13-22). Ms. Ledesma did not personally speak to the companies they were working for who initially recruited and spoke to patients. (D.E. 145 p. 21). However, she did say she knew it was wrong to fake call logs when patients were not reached. (D.E. 145 p. 18). She did not know if those call logs constituted Medicare fraud or even went to Medicare. (D.E. 145 p. 41)

Ms. Ledesma said she would never make up a cancer diagnosis, and she clarified that Government's Exhibit 472 which showed a male with ovarian cancer was changed to prostate cancer because Ms. Hernandez had verified the correct information with the patient. (D.E. 145 pp. 31-33)

Ms. Hernandez told Ms. Ledesma, before the FBI/government was involved, her NPI number which was needed to prescribe had been stolen and Ms. Hernandez was concerned about that. (D.E. 144 p. 287).

The government then called Dr. Robert Hoover, a medical director for CGS Administrators, a company contracted by Medicare. (D.E. 145 p. 61-63). He initially said Medicare will not cover a brace prescribed by a doctor who had never evaluated a patient, and an evaluation, to him, requires interaction with the patient. (D.E. 145

p. 69, 81-82). However, he later admitted this was merely his opinion and said that the actual Medicare guidelines state that the prescriber does not have to be the person who does the face-to-face evaluation and just must have knowledge about that evaluation. (D.E. 145 pp. 120, 145-47). He did not know anything specific about Ms. Hernandez or her arrangements with the companies that paid her. (D.E. 145 p. 140-41). Telehealth was approved by Medicare as a form of face-to-face visits with patients. (D.E. 145 p. 160). He agreed that per Medicare guidelines Ms. Hernandez did not have to personally conduct the face-to-face encounter with a patient to prescribe for that patient. (D.E. 145 p. 147). He could not tell by looking at the records whether Ms. Hernandez consulted with patients, but records make it appear that a medical professional had previously seen the patients. (D.E. 145 p. 166-69).

The government also called multiple higher-level cooperating witnesses to testify against Ms. Hernandez. The first was Richard Epstein. (D.E. 145 p. 187). He operated an illegal telemedicine company and an illegal marketing company (Comprehensive Telcare and Remn Management) that paid off doctors, nurses, marketing companies, and others. (D.E. 145 pp. 189-90). They dealt with DME and genetic testing, hired doctors to sign prescriptions, and sold the orders to DME companies and clinical laboratories. (D.E. 145 pp. 191-92). Mr. Epstein did this for about three years, and hired Ms. Hernandez through a recruiting company, Barton and Associates, for about one month. (D.E. 145 p. 193-97). Mr. Epstein's company hired many providers and had a standard onboarding procedure, and he did not

remember Ms. Hernandez specifically. (D.E. 145 p. 200-01).

Mr. Epstein himself drafted the language in the orders the providers signed, with the goal of including what was required for Medicare to pay for DME. (D.E. 145 pp. 204-05). The basic business model was Mr. Epstein paid telemarketing call centers to find patients, used recruiters to find prescribers, paid prescribers to sign orders, and sold the prescriptions to DME suppliers. (D.E. 145 pp. 219-25). Mr. Epstein did not tell Ms. Hernandez that the patients had not been seen by medical professionals, and his contract with Ms. Hernandez did not require her to call patients. (D.E. 145 pp. 226-29). In fact, the instructions to Ms. Hernandez said she should "please review the consult for the patient. If the consult request is approved, please sign off and the consult is complete." (D.E. 145 p. 234). Thus, what Ms. Hernandez received said there had already been a medical consultation. (D.E. 145 p. 234).

Mr. Epstein, who personally orchestrated this fraud, was permitted to plead to 63 months in prison, later reduced to 37 months, in Middle District of Florida case 8:20-cr-00196.

The government also called Michael Nolan, who co-owned the company (Remn) with Richard Epstein. (D.E. 145 p. 259). He testified to the same basic business model including using a recruiting company, Barton & Associates, to find prescribers. (D.E. 145 p. 262). He didn't remember ever talking to Ms. Hernandez. (D.E. 145 p. 263). He generally tried to make his business look legitimate to

providers like Ms. Hernandez. (D.E. 145 pp. 264-68). Ms. Hernandez was not told she needed to contact patients, only to complete and assess charts, and the "complete and assess patient charts" language featured in her employment contract to describe her role. (D.E. 145 p. 270). Mr. Nolan was sentenced to 78 months in Middle District of Florida case 8:20-cr-00195 and then had his sentence reduced to 51 months for cooperation. (D.E. 145 p. 277).

The government called Robin Sheehan, a senior program analyst/auditor for Health and Human Services. (D.E. 146 p. 8). She testified that she looked at the Docusign data for Elizabeth Hernandez and concluded she took an average of 16-17 seconds to review and sign each document. (D.E. 146 pp. 11-22). She could not say if Ms. Hernandez could have looked at the orders before the Docusign timer started. (D.E. 146 p. 28). Some of the numbers were clearly inaccurate because they showed zero seconds to sign a document, which is impossible. (D.E. 146 p. 30).

The government called four witnesses, Becky Whittemore, John Whittemore, Susan Bryan, and Alice Collins who said either they or their spouses received Medicare Explanations of Benefits or notices showing billing for genetic testing with Ms. Hernandez as the prescriber. (D.E. 146 pp. 37-98). The witnesses received the genetic tests and performed the DNA swab, sent it to the lab, and received the results, but said they either didn't consult with Ms. Hernandez or didn't have the test results explained to them, and brought this to Medicare's attention.

The government called Steven Kahn. (D.E. 146 p. 120). Mr. Kahn owned a

company, Sunrise Medical, that sold prescriptions. (D.E. 146 p. 121). He said the basic business was to get telemarketers to find patients, fill out the patient information, and a program would print a prescription that was sent to doctors to sign. Mr. Kahn would sell the signed prescription to DME providers, who would send braces out and bill Medicare. (D.E. 146 pp. 122-23). He would tell doctors to sign prescriptions within 24 hours and they did not have to bother calling patients. (D.E. 146 p. 124). He said he may have told Ms. Hernandez that another doctor or medical professional would be examining patients before she received the prescription. (D.E. 146 p. 125). Mr. Kahn admitted his company kept the credentials for the doctor's DMERx logins and his employee, Pamela Edwin, who onboarded Ms. Hernandez, was able to log into providers' DMERx accounts. (D.E. 146 p. 139).

Mr. Kahn lied on the stand, testifying he had not requested to be placed in a wheelchair to testify to avoid being shackled in court, necessitating the prosecutor to correct his lie in front of the jury. (D.E. 146 pp. 147-51). Mr. Kahn had his bond revoked on his own Medicare fraud case when a young woman whose name he did not know whom he met on the website secretarrangements.com overdosed on drugs and died in his house. (D.E. 146 pp. 151-53, 176-77). Despite this and the fact that he intentionally organized Medicare fraud, Mr. Kahn was sentenced to 11.5 years in prison on his own case, Southern District of Florida case 19-cr-80169. He then had his sentence reduced upon the Government's Rule 35 motion, largely for his cooperation in this case, despite his in-court lies. The sentence is now 92 months in

prison, a 30 percent reduction.   Mr. Kahn stated he did not know much about Ms. Hernandez, he never met her, and he never talked to her about fraud or the Medicare scam he was running. (D.E. 146 pp. 166-67).

The government called Dr. Anthony Magliocco, an expert on genetic testing. (D.E. 146 p. 176).  He testified generally that, in his opinion, a treating physician ordering genetic testing must speak to patients first, and for genetic testing to be medically necessary the patients must have active cancer. (D.E. 146 p. 185).  In his opinion, the forms he was shown with Ms. Hernandez's signature as the provider would be insufficient to document medical necessity. (D.E. 146 p. 213).

Dr. Magliocco said he only reviewed test requisition forms, not medical charts, to prepare for his testimony. (D.E. 146 p. 199).  He agreed that a document he was shown (Government Exhibit 739) showed the genetic testing patient (John Whittemore, one of the patients who testified for the government) had signed an informed consent form indicating the benefits, risks, and limitations of testing had been explained to his satisfaction. (D.E. 146 p. 231).

The government called Pamela Edwin, who worked for Steven Kahn as an office manager at Sunrise Medical. (D.E. 147 pp. 7-10).   Ms. Edwin did not speak much to Ms. Hernandez and Ms. Hernandez never came to the office. (D.E. 147 p. 32). Ms. Hernandez was one of many providers Sunrise Medical used.  The company and Mr. Kahn wanted prescribers to sign orders quickly. (D.E. 147 pp. 14-20).  Ms. Edwin did not tell Ms. Hernandez the information in the patient forms was made up

and said the orders were made to appear legitimate.  (D.E. 147 pp. 38-39).  When a patient lead came in, the company's practice was to put the lead date as the exam date in the forms that went to Ms. Hernandez and other providers, which made it look like the patient had been examined.  Ms. Edwin did not tell Ms. Hernandez this was not true. (D.E. 147 p. 43).  Ms. Edwin did not know if Mr. Kahn or someone else from Sunrise Medical was signing prescriptions using Ms. Hernandez's information, and agreed that Mr. Kahn was capable of anything. (D.E. 146 pp. 46, 55).  Ms. Edwin had her own Medicare fraud case, Southern District of Florida case 19-cr-80169, but has not yet been sentenced.

The government called Michael Stein, who developed the telemedicine platform for a company, Panda, that sold genetic testing prescriptions. (D.E. 147 pp. 61-63).  Stein used a recruiting company, Lifeline Recruiting, that hired Ms. Hernandez. (D.E. 147 p. 63).  Mr. Stein told Ms. Hernandez her job was to claim patients from the online portal, Zoho, consult with them, and complete a requisition form. (D.E. 147 p. 65, 81).  Mr. Stein acknowledged that the form language used in the documents sent to Ms. Hernandez said the prescriber had been given the patient's information to assess and confirm medical necessity. (D.E. 147 p. 129-36).  Mr. Stein was sentenced to 60 months for his Medicare fraud case, Southern District of Florida case 21-cr-20321, and then had his sentence reduced by 33 percent for cooperation, to 40 months.

The government called Anthony Gousgounis, who owned a call center that

telemarketed to people with U.S. Military healthcare. (D.E. 147 pp. 148-49). He said Ms. Hernandez agreed to help him with telemedicine for Covid-19 patients, and subsequently genetic testing. (D.E. 147 p.p. 153-54, 191). He said the companies would cold call elderly patients they hoped had Medicare benefits. (D.E. 147 p. 156). He said he told Ms. Hernandez the patients were coming from call centers. (D.E. 147 p. 156). Mr. Gousgounis had never met Ms. Hernandez or seen her in person before testifying in court. (D.E. 147 p. 161). He did not openly discuss fraud with her. (D.E. 147 p. 207). He purposely kept Ms. Hernandez and the call centers apart so that he could be the middleman and get paid. (D.E. 147 pp. 193-94). Mr. Gousgounis was sentenced to 24 months in prison on his own Medicare fraud case. (D.E. 147 p. 182).

The government called Maria Aleu, the biller who handled Medicare billing for Ms. Hernandez. (D.E. 147 pp. 210-11). She primarily billed for complex 45-minute visits for Ms. Hernandez's patients, which she said was based on Ms. Hernandez's directions. (D.E. 147 pp. 213-15). She said Ms. Hernandez did not tell her she was meeting patients for 45 minutes, she said she was doing telemedicine genetic testing consultations. (D.E. 147 pp. 278-79). Ms. Hernandez provided Ms. Aleu with call logs that showed communication with patients. (D.E. 147 p. 253). Ms. Hernandez told Ms. Aleu that somebody had stolen her NPI number used for Medicare billing. (D.E. 147 p. 247). Multiple times, Ms. Hernandez asked Ms. Aleu to remove erroneous billing, in a way that would benefit Medicare. (D.E. 147 pp. 263-64). Medicare billing mistakes happen routinely. (D.E. 147 p. 257). Ms. Aleu

took a plea to time served on her own money laundering case. (D.E. 147 p. 281).

*Ms. Hernandez's Inculpatory Statement.*

The government, out of the jury's presence, told the judge a handwritten note had been found in Ms. Hernandez's house when it was searched, and Ms. Hernandez had testified on May 16, 2023 at a pretrial motion in limine hearing as to the note's origins.  (D.E. 79, 113)

At that hearing, Ms. Hernandez testified the document was dictated to her by her attorney in preparation for a proffer meeting with the government. (D.E. 113 pp. 2-3).  She never actually read the document to the government during the proffer because "I didn't want to say anything that was not true." (D.E. 113 p. 4).  Her attorney had told her to lie to the government, apparently believing the content of the false statement would help her secure a better deal. (D.E. 113 p. 6).  Ms. Hernandez "just wrote it down because she yelled at me and told me just write down what I say". (D.E. 113 p. 7).  The motion in limine was denied because there were other family members of Ms. Hernandez on the call she had with her then-attorney, which was found to waive attorney-client privilege.

The defense said the parties had discussed the issue previously and the government had intended to introduce the cross-examination from the motion in limine. The defense had said the whole transcript should be introduced based on the Rule of Completeness, but now the government wanted to introduce none of the

18

transcript. (D.E. 148 p. 9). The judge sustained on hearsay grounds the government's objection to introducing any of Ms. Hernandez's pretrial testimony and said if she wanted to explain the inculpatory written statement she could testify at trial. (D.E. 148 p. 9). Then an issue came up as to how the government would prove Ms. Hernandez actually wrote the statement and the government said they wanted to introduce only the section of her prior testimony stating she wrote it. (D.E. 148 p. 11-12). The government said they would agree to add that Ms. Hernandez had previously testified she wrote the statement because her prior lawyer told her to. (D.E. 148 p. 13). The defense agreed to this with the extra language that the prior lawyer was not the current trial lawyer. (D.E. 148 p. 14). After conferral, the government stated they would just introduce the entire prior testimony and the defense agreed. Then the judge pushed back on that agreement and said to the prosecutor "She [defense counsel] is willing to meet you halfway by saying that there is an additional portion there, without getting into all the other stuff." (D.E. 148 p. 14). After the judge pushed back, the government retracted their agreement and said they would only introduce the portion of Ms. Hernandez's prior testimony saying she wrote the statement after a prior attorney dictated it to her. Trial defense counsel said "that's fine". (D.E. 148 p. 15).

Then the case agent, William Stewart, testified. (D.E. 148 p. 15). He said he searched Ms. Hernandez's house and one thing he found was a handwritten letter which said, *inter alia*:

> I understand that I have been involved in a large scale fraud. I did not set out to commit fraud on purpose, but by not asking the questions I was supposed to ask and by not doing the things I was supposed to, according to my license, I see now that I committed a large scale fraud." and "I wanted to believe the company because of everything I had going on in my life at the time, it was more convenient not to ask questions. It is not an excuse but an explanation. I feel responsible and feel guilty.

(D.E. 148 pp. 24-26). The jury was read the portion of Ms. Hernandez's testimony from the motion in limine that she created the document "based on attorneys' information that she gave to me, she dictated to me". (D.E. 148 p. 26). The jury was not read or told about the entire motion in limine testimony where Ms. Hernandez made it clear she was browbeaten into writing the statement and it was not true, which is why she never shared it with the government. Agent Stewart testified there was no date on the letter and the letter was never provided to the government or anybody else to his knowledge. (D.E. 148 pp. 159-60). The letter seemed like it had been put together as part of potential cooperation with the government. (D.E. 148 pp. 159-61).

The prosecutor asked the agent whether this statement was consistent or inconsistent with Ms. Hernandez's texts and emails, and the defense objected to improper lay opinion. (D.E. 148 p. 27). The Court overruled the objection and the agent testified it was inconsistent, citing various emails in Ms. Hernandez's account they argued established consciousness of guilt. (D.E. 148 pp. 27-60).

The agent said Ms. Hernandez reported her NPI number stolen in April 2019,

the same month as a federal law enforcement action called Operation Brace Yourself targeting DME. (D.E. 148 pp. 60-61). The agent did not know if Medicare placed an alert in their system so that claims using the NPI number Ms. Hernandez had reported stolen would be flagged. (D.E. 148 p. 112). He agreed that from the emails it looked like Ms. Hernandez had emailed a police report she had made about the stolen NPI to Medicare and the Office of the Inspector General to put them on notice. (D.E. 148 pp. 112-13). She also emailed the Office of the Inspector General an unsigned provider services agreement with Lifeline Recruiting, the company that recruited her for the genetic testing at issue. (D.E. 148 p. 158).

The defense called Michael Haas, an IT systems analyst who worked in the health care IT field and was qualified as an expert. (D.E. 148 p. 195-98). He got access to Ms. Hernandez's Docusign account and downloaded all of the certificates of completion and orders. (D.E. 148 p. 208). He was able to pull the IP addresses where some of the Docusign documents were accessed from Puerto Rico (D.E. 148 p. 215) and from other IP addresses that did not match the IP addresses he had for Ms. Hernandez and Ms. Ledesma. (D.E. 148 pp. 221-29, 256-59). He also found many duplicate orders and opined as an expert that the government's numbers for the claims allegedly billed by Ms. Hernandez appeared to be inflated. (D.E. 148 p. 238). A partial analysis found 2,223 claims for IP addresses that were not associated with Ms. Hernandez but which the government alleged were from her. (D.E. 149 p. 15). There were also claims that were not paid that were included in the

government's numbers. (D.E. 149 p. 21).

<em>Closing Argument.</em>

In discussing the time the Court would allot for closing argument, the prosecutor noted the trial had been lengthy and asked for an hour for closing. The judge said it would give the government 40 minutes and the defense 30 minutes for closing. (D.E. 149 p. 57).

The government argued in closing that prescribing DME, prescribing genetic tests, or billing for visits that did not occur each individually constituted guilt of conspiracy to commit health care fraud and wire fraud, and they only had to prove one of those things. (D.E. 149 p. 60). They said "every single time" Ms. Hernandez electronically signed a Medicare document she was lying. (D.E. 149 p. 61). The government said Ms. Hernandez's NPI number was not really stolen and she had reported it was to try to cover up her fraud. (D.E. 149 p. 74). The government said Ms. Ledesma had testified she was signing prescriptions in two minutes or less, but Ms. Hernandez, through her biller, was billing for 45-minute visits and Ms. Hernandez was being paid for 45-minute visits. (D.E. 149 pp. 76-77). The government also said that although initially Ms. Hernandez was recruited by a recruiting company and did not deal with telemarketers herself, Ms. Gousgounis had testified he had connected her to a telemarketing company, Ocean Power Media, who paid her directly for fraudulent prescriptions. (D.E. 149 pp. 78-79). The government

also discussed the inculpatory written statement found in Ms. Hernandez's house, saying she wrote the note to herself and maybe her attorney dictated it but "someone had a moment of clarity. She wrote this." (D.E. 149 p. 81).

The defense in closing said Ms. Hernandez had not taken the care she should have and had made mistakes, but ultimately was overwhelmed with work, was dealing with companies that appeared legitimate, and was prescribing DME and genetic testing for people she believed wanted them and qualified for them, so was not guilty of fraud. (D.E. 149 p. 85). The defense argued Ms. Hernandez did not have the intent to defraud anyone. (D.E. 149 p. 87). The defense noted that per contracts, Ms. Hernandez's job was to "complete and assess" patient charts, not call patients, and Ms. Hernandez thought the patients had already been seen by doctors based on the charts she received. (D.E. 149 pp. 88-90). The DME braces could be purchased over the counter and even the government's expert on DME, Dr. Hoover, agreed the charts Ms. Hernandez received made it look like the necessary patient evaluation had already been done. (D.E. 149 p. 94-96). It was, the defense argued, permissible per Medicare guidelines for the prescriber to prescribe DME without being the treating practitioner who conducts the face-to-face evaluation on the patient. (D.E. 149 pp. 96-97).

As to genetic tests, government cooperator Mr. Stein testified he never talked about fraud with Ms. Hernandez. (D.E. 149 p. 97). There was a letter from Mr. Stein to Ms. Hernandez supporting that Ms. Hernandez just needed to look at the

requisition form and make sure the patient qualified in order to sign. Mr. Stein lied in his testimony about telling Ms. Hernandez to call patients because he was trying to get his sentence reduced by the government. (D.E. 149 pp. 97-99).

The defense also argued the evidence was that Medicare rules changed in March 2020, to permit telemedicine for new patients as well as established patients. (D.E. 149 pp. 101-02). The defense acknowledged there was a billing error since patients were not seen in office, but the biller, government cooperator Ms. Aleu, made that error and there was no evidence that Ms. Hernandez requested Ms. Aleu use the incorrect office billing code. (D.E. 149 pp. 102-03).

In the middle of a sentence ("And, we didn't see any evidence that Eli provided any fake charts; right? Like, she is asking her for more information, and she is not trying to anything fake—") (D.E. 149 p. 103) the judge cut off defense counsel and counsel said "Judge, I need ten more minutes. I believe the government went over." (D.E. 149 p. 103). The judge said "No, they didn't. . . . Your time is up." (D.E. 149 p. 103). The defense said "Please, the government went over. May I have ten more minutes?". (D.E. 149 p. 103). The judge said they didn't go over and flatly denied the defense's request for more time. (D.E. 149 p. 103). The judge said "Your time is up" and the defense briefly asked the jury to find Ms. Hernandez not guilty and sat down. (D.E. 149 p. 104). The judge said the government had four-and-a-half minutes left for their rebuttal closing. (D.E. 149 p. 104).

In rebuttal, the government argued that Ms. Hernandez did know she was

committing fraud. (D.E. 149 p. 104-05). Furthermore, to the government, the orders themselves were plainly fraudulent since they said she examined people and established a provider-patient relationship with them when she had not. (D.E. 149 p. 105). The government also argued deliberate ignorance and that Ms. Hernandez did not ask what doctors were seeing the patients before she did. (D.E. 149 p. 106).

Although the transcripts of course do not reflect the elapsed time for each party's closing argument, other than what the judge said about time being up for the defense, it should be noted the initial government closing went from page 58-85 (28 pages) and their rebuttal from 104-07 (4 pages) for a total of 32 pages. The defense closing went from page 85-104 (20 pages). In sheer volume of argument by transcript pages, the government got 60% more volume than the defense, even more than the 33% the judge officially allowed by giving the defense 30 minutes and the government 40 minutes.

At the first opportunity (after the judge read the jury instructions) the defense objected

> to the Court's refusal to give me additional time for the closings. The defense got ten minutes less than the government did. We didn't have a fair amount. We didn't find out about it until this morning after yesterday, preparing presentation, as the government correctly pointed out, I don't think the number of days on the case accurately reflects the complexity, there were 20 government witnesses to include two experts, as well as the defense.
> I was unable to go into false statements, Counts 8 through 10, the amount paid, Mr. Haas, Ms. Hernandez's statements, deliberate ignorance, Joanna Ledesma, lack of evidence, patients, and good

faith as a result.

(D.E. 149 p.129).  The judge said the defense did not object when he said they would get 30 minutes before closings, and the defense said they "asked for the same amount of time as them during it, I said "Can I have more so I can be equal to them?" At the end of the day, the defense was not given the same amount, and I think that is unfair treatment for Ms. Hernandez, in getting a fair end of trial." (D.E. 149 p. 130).  The judge said asking at the end of closing when he had said time was up was "too late" and that 30 minutes was "more than ample, given the length of the trial.  And, I did give the government ten additional minutes because, quite frankly, it was the Government's burden to prove." (D.E. 149 p. 130).  The judge said he did not feel it was unfair to give the government more time and "you got the time you need, I thought you needed as well as you could have". (D.E. 149 p. 131).

During jury instructions, without objection the judge told the jury "A defendant is required to prove good faith". (D.E. 149 p. 122).

The jury returned a verdict of guilty as to the conspiracy count and most of the substantive counts. (D.E. 149 pp. 139-40).

*Sentencing.*

The PSI recounted the many related cases, including those of cooperating witnesses who testified in this trial, and that all resolved to significantly less than the

20 years of imprisonment imposed on Ms. Hernandez. (D.E. 171 pp. 4-6). For Ms. Hernandez, the PSI states the recommended guidelines range is 210-262 months and the statutory maximum is 20 years for the most serious offense, Count One. (DE. 171 p. 28). The PSI states that Ms. Hernandez is accountable for a loss of $192,075,966 (D.E. 171 p. 20). This is based on how much the PSI says Medicare was billed. (D.E. 171 p. 15). The PSI says Medicare in fact paid $111,261,526 relevant to this case. (D.E. 171 p. 15). The higher figure is intended loss, the lower is actual loss.

The defense filed objections to the PSI arguing actual loss, not intended loss, is the proper measure of loss under the sentencing guidelines. (D.E. 174). They also argued in a sentencing memorandum that Ms. Hernandez personally received $1,666,057. (D.E. 180 p. 5).

The government's sentencing memorandum argued intended loss is the proper metric. (D.E. 179 pp. 2-5). The government argued for a guidelines sentence. (D.E. 179 pp. 6-12).

At sentencing, the defense argued actual and not intended loss is the proper metric, and the Court said that it was aware this was an issue being litigated and believed intended loss was the proper metric and overruled the defense objection, which was preserved. (D.E. 198 pp. 5-6). The judge said it "is prudent to note that an alternative sentence, post—would be to impose what would be a reasonable sentence, and that—in that case, the sentence that I impose today would be both with

the application of the guidelines provision as actual or intended, but also a reasonable sentence, which would be the same" so the "Circuit has the benefit of knowing what the Court's sentence would be, viewed even in the event that the guideline calculation was incorrect". (D.E. 198 p. 6). The defense noted that Ms. Hernandez had not disputed the basic facts of the case at trial, only whether her conduct legally amounted to Medicare fraud. (D.E. 198 pp. 8-9).

The judge noted that all of the codefendants had pled guilty rather than go to trial. (D.E. 198 pp. 28-30). The judge said he felt the sentence had to provide deterrence and make it clear to people in the community that if they engage in this kind of fraud, are caught, go to trial, and lose they will get a significant penalty. (D.E. 198 p. 35). The Court imposed a 240-month prison sentence on Count 1, and lesser sentences on the other counts to run concurrent. (D.E. 149 p. 36).

This direct appeal follows.

## STANDARD OF REVIEW

1. Errors in managing a trial, such as allocation of closing argument time, are reviewed for abuse of discretion. *United States v. Boston*, 194 Fed.Appx. 890 (11th Cir. 2006).

2. Unpreserved jury instruction issues are reviewed for plain error. *United States v. Hyde*, 22-10322, 2024 U.S. App. LEXIS 4107, 2024 WL 726909 (11th Cir. Feb. 22, 2024)

3. The denial of a cause challenge is reviewed for abuse of discretion. *United States v. Rhodes*, 177 F.3d 963, 965 (11th Cir. 1999).

4. Unpreserved departures from the judicial obligation of neutrality are reviewed for plain error. *United States v. Caldwell*, 81 F.4th 1160 (11th Cir. 2023).

5. Sentencing guidelines calculation errors are reviewed for abuse of discretion. *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The district court erred in giving the government 33 percent more time for closing argument than the defense, and cutting off the defense mid-closing argument. The unequal time prevented the defendant from being able to adequately summarize her case and constituted a due process and equal protection violation. The district court erred in instructing the jury the defendant had the burden of proving good faith. The district court erred by failing to grant the defense an additional peremptory challenge after erroneously denying a cause challenge. The district court erred in involving itself, and departing from neutrality, regarding a dispute over what context for Ms. Hernandez's inculpatory statement would be provided. Finally, the district court erred by using intended rather than actual loss amount in its sentencing guidelines calculation.

# ARGUMENT

### I. The District Court Reversibly Erred in Limiting the Defense's Closing to Thirty Minutes When the Government Received Forty Minutes, 33 Percent More Time.

This case was significantly contested as to Ms. Hernandez's *mens rea*. The defense was that she did prescribe DME and genetic testing but did not bill Medicare for them, and did submit through a biller the telemedicine consults at issue, but she did not have the requisite intent to defraud Medicare. As to the DME and genetic testing, the defense argued, with significant evidence in support, that the documents Ms. Hernandez received were intentionally manipulated by the companies who were orchestrating this fraud. They made it appear *to Ms. Hernandez* that the patients had already had the requisite medical consultation and therefore that she did not need to see them. It was undisputed that Medicare permitted a prescriber to issue prescriptions based on another medical professional having seen and evaluated the patient. As to the telemedicine visits, the defense acknowledged they were billed erroneously, but this was an honest mistake by a third-party biller and not intentional fraud by Ms. Hernandez. The government of course argued different conclusions from the evidence, but there were legitimate questions for the jury to resolve regarding *mens rea*. Summation, as it often is in criminal cases, was critical for both sides to argue to the jury how they should view and synthesize the evidence they had heard.

The district court erred in unreasonably restricting the defense's closing to thirty minutes when it gave the government forty minutes, or thirty-three percent more time. This had been a complex seven-day trial (six days of evidence and a day of jury selection), with closing argument occurring nine days after the jury was selected. The government had called twenty witnesses including multiple experts and cooperators. There were also hundreds of voluminous documentary exhibits in this case, and a serious dispute between the parties as to the meaning of those exhibits.

After a full week of witness testimony featuring multiple experts and non-intuitive subject matter, allowing the defense only half an hour to summarize the case favorably for the defendant is well outside the bounds of reasonableness. This unreasonableness is only underscored when the parties are treated asymmetrically and the government is given thirty-three percent more time than the defense.

The only articulated rationale for giving the government extra time was their burden of proof. The Constitutional burden of proof is not an excuse for a handicap in favor of the government—it is the opposite, like most other aspects of our Constitutional system of trial by a jury of one's peers. The founders believed that it *should* be difficult for the government to imprison an American, hence the burden of proof beyond a reasonable doubt and the other procedural and substantive due process protections guaranteed by the Constitution. The foundational premise of our adversarial system of criminal justice is that the government does *not* get an

31

advantage over the defendant. Both sides, at a minimum, should be treated equally—

there is no place in our system for a judicial assist to the government to make up for

the fact that they have the burden of proof.

By giving the government more time than the defense to sum up their case,

apparently out of some perception they deserved an advantage due to their burden of

proof, the judge departed from his required neutral role. It is the role of an appeals

court to correct this, both to deliver a fair trial and due process in this case and to

ensure criminal defendants receive a fair trial and due process in future cases.

Undersigned counsel has not located previous cases where a judge gave one

side more time than the other side in closing argument and cut off the defense.[1]

Likely this is because doing so is exceedingly rare—most judges naturally see both

parties should be treated equally in such procedural decisions. The caselaw on

limitations on defense closing arguments makes it clear that the question on appeal

is whether the district court abused its discretion in such a procedural ruling. This

---

[1] The only case undersigned counsel found addressing this situation is *People v. Lopez*, 974 N.E.2d 291 (Ill. 1st District 2012), an Illinois state intermediate appellate court case where the defense argued that it was a due process violation for the judge to indicate they would give the State more time than the defendant in closing, although the Court did not cut off the defense or curtail their actual argument. That Court said the defense did not show any prejudice since he "failed to indicate what argument he was not allowed to make or how the time limit affected those arguments he did make". *Id.* at 316. That is clearly distinguishable from this case where the Court did cut the defense off and the defense did specifically state what arguments they were unable to make. The *Lopez* Court said that "we do not condone the imposition of unequal time limits on defense and the State [but] in this particular case, defendant has failed to show that the trial court's decision to do so deprived him of a fair trial." *Id.* at 317.

Court in *United States v. Boston*, 194 Fed.Appx. 890 (11th Cir. 2006) said that a district court "has an obligation to insure a fair trial" (*citing United States v. Thayer*, 204 F.3d 1352, 1355 (11th Cir. 2000) but also "has broad discretion in the management of the trial" and will not be reversed "absent a clear showing of abuse" (*citing United States v. Hilliard*, 752 F.2d 578, 582 (11th Cir. 1985). In *Boston* the district court shortened the defense closing argument as a penalty for failing to subpoena a witness which caused the trial to run over what the judge had told the jury based on prior representations from the defense. Furthermore, "Boston was not prevented, during his closing argument, from making all legal arguments supported by the facts. . . . Neither below nor on appeal does he point to any specific legal arguments that he was not allowed to make." *Boston* at 894. Those facts are diametrically opposed to the instant case, where Ms. Hernandez was prevented from arguing multiple points by being cut off in the middle of closing, and specifically objected and proffered the areas she would have argued with equal time.

The law on abuse of discretion is that "[t]he trial court abuses its discretion only when the judge's conduct strays from neutrality, and even then only when its remarks demonstrate pervasive bias and unfairness that actually prejudice a party." *United States v. Montor-Torres*, 449 Fed.Appx. 820, 824 (11th Cir. 2011) (*citing United States v. Hill*, 643 F.3d 807, 845-46 (11th Cir. 2011)). Both parts of the abuse of discretion test are met on the facts of this case. Giving the government more time than the defense is self-evidently straying from neutrality. The time disparity for

33

closing argument actually prejudiced the defendant because she was not able to address at all significant parts of the case favorable for the defense. The defense proffered what those areas were and specifically requested a reasonable amount of time, 10 more minutes to give them equal time with the government.

Defense counsel should have been afforded sufficient time to address the jury with respect to each of Ms. Hernandez's defenses and claims. The defense correctly argued they were "unable to go into false statements, Counts 8 through 10, the amount paid, Mr. Haas, Ms. Hernandez's statements, deliberate ignorance, Joanna Ledesma, lack of evidence, patients, and good faith as a result" of being cut off. (D.E. 149 p. 129).

As to Ms. Hernandez's statement, counsel would have argued the statement should not be considered because it was dictated to Ms. Hernandez by prior counsel who thought it was what needed to be said in order to get a favorable plea deal from the government, and Ms. Hernandez never shared it with the government because it was not true and she did not want to lie. This demonstrates she was unwilling to adopt it even if it would have helped her, since she did not have the *mens rea* necessary to commit the charged crimes.

As to Joanna Ledesma, there were significant arguments to be made based on her testimony which went directly to *mens rea*. She said she didn't believe she was committing fraud, and she didn't know what procedures the companies were using to find and screen these patients. And of course Ms. Ledesma was testifying to avoid

being prosecuted herself.

The Defense was also proffered that they were unable to address good faith. Ms. Hernandez's defense was that she was acting in good faith and relied on what she was told or understood about the companies she contracted with. The companies told her the requisite medical examinations of the patients were done before her involvement, both orally and via the forms she signed.

Beyond the above, the unreasonable restriction on closing prevented the defense from even mentioning the exculpatory testimony of their only defense witness, Michael Haas. That testimony was he reviewed a small subset of IP addresses and there were numerous logins using Ms. Hernandez's NPI which were from locations she had never been to. This was concrete objective evidence bolstering that her NPI information in fact was stolen, and used by someone else to commit fraud.

The defense was also prevented from arguing that the government had not proved any false statements, since they introduced only the patients' prescriptions but not the charts signed by Ms. Hernandez. A video introduced at trial showed the charts did not mirror the prescriptions. (D.E. 147 pp. 19-29, referring to Government Exhibit 517).

Ultimately, the defense was precluded from summarizing this case as characterized by a throughline of lack of evidence as to Ms. Hernandez's intent to defraud anyone, particularly because several of her supposed co-conspirators went

to significant lengths to deceive her as to what they were doing, because contracts and records made it appear that doctors had already evaluated the patients, and because for the DME and braces she was not involved in the Medicare billing process.

In a fair trial, the defense would have been given the time necessary to synthesize a full week's worth of testimony for the jury, not cut off in the middle of closing argument, and certainly not given less time than the government because the judge apparently felt it right to advantage the government because they had the burden of proof. Under the circumstances presented, the trial court's limitation on closing argument rises to the level of an abuse of discretion and this Court should reverse and remand.

## II. The District Court Reversibly Erred in Instructing the Jury That The Defense Had the Burden Of Proving Good Faith.

The judge instructed the jury "A defendant is required to prove good faith". (D.E. 149 p. 122). That is incorrect—it is the government's burden to prove a criminal case beyond a reasonable doubt, including to prove beyond a reasonable doubt the absence of good faith in a fraud case. That is what the standard jury instruction says: "'Good faith' is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The government must

prove intent to defraud beyond a reasonable doubt." 11th Circuit Standard Jury Instructions S17. The written jury instructions in this case did correctly say that the defendant was **not** required to prove good faith. The defense did not object to the oral instruction, likely because they did not notice the judge departed from the standard written instruction.

Good faith was the entire issue in this case. The question for the jury was what was Ms. Hernandez's state of mind/*mens rea*? Did she intentionally and knowingly defraud the government, or did she act in good faith on the representations of the companies she contracted with regarding their compliance with Medicare rules and medical standards of care?

Assigning the burden to the defendant to "prove good faith" is fundamental, or plain, error. "Plain error consists of error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of judicial proceedings." *United States v. Russell*, 703 F.2d 1243, 1248 (11th Cir. 1983). "The instruction must be an incorrect statement of law that was probably responsible for an incorrect verdict, leading to substantial injustice." *United States v. Hyde*, 22-10322, 2024 U.S. App. LEXIS 4107, 2024 WL 726909 (11th Cir. Feb. 22, 2024) (internal quotation and citation omitted).

In *Mann v. United States*, 319 F.2d 404 (5th Cir. 1963), this Court (which was then the Fifth Circuit) reversed for plain error when the jury was instructed, without

37

objection, that there was a presumption that person intended the normal consequences of their acts, which the Court found shifted the burden away from the prosecution. This was plain error even though the correct instruction on the overall burden of proof was given, since "Instructions to the jury must be consistent and not misleading. The fact that one instruction is correct does not cure error in giving another inconsistent one." *Id.* at 410. This Court (as the Fifth Circuit) issued explicit directions to trial courts not to shift the burden in *United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977). *See also Berkovitz v. United States*, 213 F.2d 468 (5th Cir. 1954).

Here, telling the jury that Ms. Hernandez had the burden of proving she acted in good faith, when the correct legal standard is the opposite, was plain error. The entire defense in this case was that Ms. Hernandez was overburdened by the contracting work she took on for what ended up being companies whose business model was based on Medicare fraud, but she did not personally commit fraud or know about it. Instead, she believed the patients she prescribed for had already been seen by other medical professionals based on her contracts and the paperwork she received, and she was permitted to prescribe based on those prior consultations and her review of the documentation prepared. There was ample evidence at trial that the men who ran the fraudulent companies did not share details of their business practices with her and actively tried to keep providers such as Ms. Hernandez walled off from their businesses. A trial in which the jury was told Ms. Hernandez had to

prove her own good faith is fundamentally not a fair trial. She was constitutionally entitled to a trial that did not shift the burden of proof to her on the sole disputed issue.

### III. The District Court Reversibly Erred in Denying a Cause Challenge on Juror Mikels.

Juror Mikels specifically said he should not sit on this case due to his preconceived notions about Medicare fraud. Despite candidly acknowledging he should not sit, the trial court denied a defense cause challenge on Juror Mikels. The defense used a peremptory challenge to avoid this biased juror sitting on the jury, and requested an additional peremptory challenge *and specifically identified the juror they would have used the additional peremptory challenge on*, which was Juror 32, who sat on the jury.

The denial of this cause challenge was error. The Sixth Amendment guarantees a criminal defendant the right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). Cause challenges are a tool for removing biased jurors. They must be granted when "the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed". *Fennell v. Sec'y, Fla. Dep't of Corr.*, 582 Fed.Appx. 828, 832 (11th Cir. 2014); *United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993).

The defense had no choice but to use a peremptory challenge on Juror Mikels,

because they were improperly denied the cause challenge, and exercising a peremptory challenge was the only way to keep this actually biased juror from sitting. This meant they had one fewer peremptory challenge than they would have otherwise had, which became an issue when they ran out of peremptory challenges. The defense then requested an extra peremptory challenge and identified the juror they would use it on, Juror 32.

The background law is that "a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause". *United States v. Martinez-Salazar*, 528 U.S. 304, 317 (2000). However, in that case, as Justice Souter noted in concurrence, the defense did not show that he would have used the peremptory challenge in question on another juror or ask for a make-up peremptory challenge. *Id.* at 317-18.

While this Court has typically not found an abuse of discretion in failure to grant additional peremptory challenges after a denial of a cause challenge, it has not squarely addressed the circumstances present in this case: a clearly erroneously denied cause challenge paired with a situation where the defense was prevented from removing a specifically identified juror because they were erroneously forced to exercise a peremptory challenge. *United States v. Collins*, 437 Fed. Appx. 760 (11th Cir. 2011) (Court did not find that the denial of the cause challenge was error nor was a specific juror identified); *Spivey v. Head*, 207 F.3d 1263 (11th Cir. 2000) (court

did not find that the denial of the cause challenge was error); *United States v. Davis*, 854 F.3d 1276, 1296-97 (11th Cir. 2017) (no prejudice where the defense did not exhaust its peremptory challenges).

The purpose of a peremptory challenge is to excuse a juror that the defense (or prosecution) does not want to sit on the jury but whose answers during *voir dire* do not reveal actual bias. A party can use a peremptory challenge "for any reason at all, as long as that reason is related to his view concerning the outcome" of the case and is not related to race or gender discrimination. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). Peremptory challenges have "very old credentials" and have been standard in English common law since the 1300s. *Swain v. Alabama*, 380 U.S. 202, 213 (1965) (*citing* The Ordinance on Inquests, 33 Edw. 1, Stat. 4 (1305)). They also have a continuous history of use in America, being "freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross-section of a heterogeneous society". *Swain* at 218. "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry, and without being subject to the court's control . . . the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable [than a cause challenge]." *Swain* at 220.

The practice of denying appellate relief even when a defendant has to use a peremptory challenge on a juror that should have been stricken for cause, and identifies a specific juror they would have used the peremptory on, is inconsistent

with this longstanding right to peremptory challenges. The defendant has suffered harm and been prejudiced in this circumstance—she is unable to use a peremptory challenge on an identified juror she did not want on her jury because she wrongly had to use that peremptory on a juror that should have been excused for cause. A juror she did not want on the jury is in fact on the jury.

A defendant has a right to peremptory challenges. A procedure that forces them to use those peremptory challenges on actually biased jurors deprives the defendant of that right. "A right without a remedy is unknown to the law." *Barrett v. Holmes*, 102 U.S. 651 (1880). "There can be no right without a remedy to secure it." *Hawkins v. Barney's Lessee*, 30 U.S. 457 (1831).

This Court should therefore hold that when all of the following conditions are met, reversible error has been demonstrated: a) the court erroneously denies a cause challenge; b) the defense uses a peremptory challenge on that juror; c) the defense exhausts their peremptory challenges; d) the defense requests an additional peremptory challenge based on the erroneous denial of the cause challenge; e) the defense identifies the objectionable juror it would use the peremptory challenge on; f) the court denies the request for the additional peremptory challenge; and g) the objectionable juror sits on the jury that convicts the defendant.

**IV. The District Court Reversibly Erred in Interjecting Itself Into A Dispute Over What Context the Jury Would Be Given Regarding an Inculpatory Prior Statement by Ms. Hernandez, and Thereby Departing from the Principle of Neutrality and Violating the Rule of Completeness.**

A major piece of evidence against Ms. Hernandez was the written statement found in her home during the execution of a search warrant, which taken on its face said she knew or should have known (i.e., deliberately ignored) she was committing Medicare fraud. As has been discussed, this statement was, per Ms. Hernandez's testimony at a pretrial motion in limine, dictated to her by her then-attorney in preparation for a proffer meeting with the government. She did not share it with the government because it was not true. She also said that she only wrote it down because her attorney was yelling at her on the phone to do so. The jury heard that she claimed her lawyer had given her this statement but did not hear that a) she had been yelled at by her lawyer to write it down after pushing back; and b) that the statement was false and she never intended on sharing it because she did not want to lie to the government. The jury would have heard all of this, but for the trial judge's intervention.

By getting involved without a government objection or request for a ruling, and by pushing back against a government concession that would have benefitted Ms. Hernandez, the trial judge departed from his obligation to be a neutral arbitrator.

A judge has a basic obligation to be neutral and conduct a trial impartially. *See United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988). This is a constitutional due process entitlement for a criminal defendant. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) Here, the trial judge rejected a resolution to this issue the parties had agreed on in favor of a different resolution that was beneficial to the prosecution and harmful to the defense. The trial judge did this despite acknowledging he was not familiar with Ms. Hernandez's prior testimony.

The trial court's lack of neutrality also violated Ms. Hernandez's rights under Federal Rule of Evidence 106, the rule of completeness, which states that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time" despite any hearsay objection. The Seventh Circuit has instituted a persuasive four-part test for whether evidence should be admitted pursuant to Rule 106: "(1) does [the evidence] explain the admitted evidence, (2) does it place the admitted evidence in context, (3) will admitting it avoid misleading the trier of fact, and (4) will admitting it insure a fair and impartial understanding of all the evidence." *United States v. Velasco*, 953 F.2d 1467, 1475 (7th Cir. 1992). In this case, the admitted evidence is the inculpatory written statement, and Ms. Hernandez's motion in limine testimony was the context necessary for the jury to have a complete understanding of the significance of that admitted evidence. The purpose of Rule 106 is to introduce this sort of context so

the jury has the full picture regarding the statement, which the parties had agreed to do until the judge intervened.  *See, e.g., Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 171-72 (1988).  *United States v. Williams*, 930 F.3d 44, 60 (2nd Cir. 2019).

Although the government and judge each argued that Ms. Hernandez could take the stand to explain the statement, (D.E. 148 p.8-9) the defendant should not be forced to "choose between leaving the government's distorted presentation unanswered and surrendering the Fifth Amendment right not to testify."  *United States v. Quinones-Chavez*, 641 Fed.Appx. 722, 731 (9th Cir. 2016) (Fisher, J., concurring in part and dissenting in part).

The Court in *United States v. Young*, CR-09-140-B-W, 2010 U.S. Dist. LEXIS 35494, 2010 WL 14614574 (D. Me. Apr. 9, 2010) dealt with a strikingly similar situation.   The defendant gave an inculpatory written statement to the government, and then later completed a second statement explaining the inculpatory statement. The government sought to introduce only the first statement and argued that the defendant held "the keys to clarification in his hands" as he could testify.  The Court said that based on the rule of completeness both statements would be admitted, and "[t]he implication that the July 25, 2007 statement was Mr. Young's only explanation, an explanation that runs counter to his defense theory at trial, and the impact of the admission of only one statement and not the other on his Fifth Amendment right against self-incrimination are the deciding factors.".  In this case, too, "in fairness" Ms. Hernandez's explanation for the inculpatory statement, that

she was compelled by her attorney to write it and did so even though it was not true, and for that reason did not ever give it to the government because she did not want to lie to them, should have been admitted pursuant to Rule 106. It is not a satisfactory answer to simply say that she could have waived her Fifth Amendment rights and testified.

Although trial defense counsel did raise the rule of completeness, they did not object to the overall intervention by the trial judge after the parties reached an agreement, and ultimately said "that's fine", so granting relief on this issue would require a finding of plain error. In *United States v. Miles*, 10 F.3d 1135 (5th Cir. 1993) the Court found plain error when a judge involved himself in plea negotiations to the detriment of the defendant. The case was remanded for new plea proceedings before a different judge. The bottom line is that "judges cross the line of impartiality if they misemploy their powers by assuming the role of an advocate or otherwise using their judicial powers to advantage or disadvantage a party unfairly." *United States v. Raymundi-Hernandez*, 984 F.3d 127, 146 (1st Cir. 2020) (cleaned up, internal quotations and citations omitted). Plain error requires: 1) an error; 2) that is plain; 3) that affects the defendant's substantial rights; and 4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright*, 392 F.3d 1269, 1279-80) (11th Cir. 2004). This standard is met here—it was error to intervene *sua sponte* in an agreement between the parties as to what context would be given to the jury regarding the defendant's statement, her substantial rights

were affected since this statement was central to the government's case, and ultimately the fairness and result of the proceedings was seriously compromised when the jury never heard, due to the judge's improper intervention, the entire testimony stating why Ms. Hernandez had transcribed the seemingly inculpatory statement. This Court should find plain error based on this departure from the district court's obligation of neutrality and violation of the rule of completeness.

**V. The District Court Reversibly Erred in Sentencing Ms. Hernandez Based on Intended Rather than Actual Loss Amount.**

The intended loss in this case was about $192 million, and the actual loss was about $111 million. (D.E. 174, 176). The PSI was calculated with the $192 million intended loss amount, which resulted in a base offense level of 37 and a guidelines range of 210-262 months imprisonment. (D.E. 176 p. 28). The Court sentenced Ms. Hernandez to 240 months, which is within the intended loss range. However, if the actual loss figure was used, the base offense level would have been 35 and the guidelines range 168-210 months. (D.E. 174 p. 2). The defense objected to the use of intended rather than actual loss. (D.E. 174). The trial judge overruled the objection and used the intended loss amount resulting in the higher guidelines calculation, and also said he would have imposed the same sentence even if the guidelines calculation was incorrect. (D.E. 198 pp. 5-6).

Using intended loss rather than actual loss was error. The guideline (§ 2B1.1)

discusses "loss".  The **commentary** to the guideline discusses "intended loss" and says the greater of intended or actual loss is "loss".  In *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) the Court found based on the Supreme Court's case of *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), *Stinson v. United States*, 508 U.S. 36 (1993) was no longer good law and the Court should only look to the commentary if the guideline itself is "genuinely ambiguous", as without such ambiguity "there is no plausible reason for deference to the commentary".  Administrative agencies like the Sentencing Commission do not write laws, so if a regulation is not uncertain, "[t]he regulation just means what it means—and the court must give it effect, as the court would any law." *Dupree* at 1275, *quoting Kisor* at 2415.

The defense position is that "loss" in § 2B1.1 is unambiguous and refers to actual loss, not intended loss.  If someone's house is burglarized and the robbers take $1000 in cash but not a diamond ring which the burglars did not locate, the victim says "I lost $1000", not "I lost $1000 and my diamond ring" on the theory that the burglars clearly intended, but failed, to take everything of value.  Actual loss is the common-sense definition of "loss" and the only plausible thing any reasonable person would mean when they discuss the amount of monetary "loss" caused by a crime.  Resorting to the commentary and its provisions about intended loss is impermissible as there is no ambiguity.

This is what Judge Ruiz found in *United States v. Patel*, 19-cr-80181, 2023 US Dist LEXIS 148507, 2023 WL 5453747 (S.D. Fla. Aug. 23, 2023).  § 2B.1.1 is

unambiguous and the proper measure of loss is actual loss. The Third Circuit also said this in *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022). Given the language of *Dupree* and *Kisor* the district court here was wrong that intended loss rather than actual loss was the appropriate metric. Here the $81 million difference between actual and intended loss would change the guidelines base offense level and thus the ultimate guidelines sentencing recommendation. When the guidelines are calculated incorrectly, the remedy is resentencing. *United States v. Butler-Jackson*, 20-14843, 2022 U.S. App LEXIS 299, 2022 WL 41728 (11th Cir. Jan. 5, 2022).

Although the trial judge played lip service to the concept that he would have imposed the same sentence no matter what even if he was wrong about the guidelines, this Court should not accept that artificial conclusion. It is clear the only reason the judge said that was to try to foreclose an appellate issue. This is particularly obvious because the judge said it at the outset of the hearing, well before pronouncing sentence and before having heard any evidence as to the other sentencing factors besides the actual loss/intended loss legal issue. *Compare United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006) (the judge's statement **while pronouncing sentence** that he would have imposed same sentence meant any error was harmless).

This Court should not countenance sentencing becoming a game where a trial judge can avoid meaningful review by making a preliminary statement that "no matter if I make any error here whatever result I reach is what I would have reached

without making the error." The 20-year sentence would have been a departure if the correct, actual, loss figure was used, and it is not credible that the judge would have departed upwards in this case if not relying on an erroneous scoresheet. There are also no departure reasons in the record. *See Gall v. United States*, 552 U.S. 38, 50 (2007) (judge departing from guidelines must consider extent of deviation and ensure justification for variance and "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the expectation of fair sentencing"). "Nothing could be less meaningful than labeling an error harmless so long as a district court states it would impose the same sentence in the event it erred, without also thoroughly explaining why it would do so. The exception has now swallowed the rule. . . . The evolution of our harmless error jurisprudence has reached the point where any procedural error may be ignored simply because the district court has asked us to ignore it." *United States v. Gomez-Jimenez*, 750 F.3d 370, 390-91 (4th Cir. 2014) (Gregory, J., concurring in part and dissenting in part). When the pronounced sentence is not in the correct guidelines recommended range, and the sentencing judge gives only a prefatory statement that "whatever I do today I would do regardless of any error I am otherwise making" the remedy should be resentencing. *See United States v. Bordeaux*, 108 F.4th 702, 705-06 (8th Cir. 2024) (reversing on plain error when judges guidelines calculation error resulted in sentence outside correct guidelines range).

# **CONCLUSION**

For the foregoing reasons, Elizabeth Hernandez respectfully requests that this

Court reverse and remand for a new trial, or alternatively a new sentencing hearing.

Respectfully submitted,

_/s/ Daniel Tibbitt
Daniel Tibbitt
Daniel J. Tibbitt, P.A.
1175 NE 125th Street
Suite 404
North Miami, Florida 33161

(305) 384-6160

Fl. Bar No: 816361

dan@tibbittlaw.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief is 12,981 words in length, and has been prepared using Microsoft Word and is typed in proportionally spaced Times New Roman 14 point font.

s/ Daniel Tibbitt
Daniel Tibbitt

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December, 2024, I electronically filed the foregoing with the Clerk of Court for the Eleventh Circuit Court of Appeals using the CM/ECF system, and served a copy on all persons registered for electronic service through the CM/ECF system.

s/ Daniel Tibbitt
Daniel Tibbitt