# No. 24-10047

# In the United States Court of Appeals
# for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff–Appellee*,

v.

ELIZABETH HERNANDEZ,

*Defendant–Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
NO. 1:22-CR-20152-KMM

THE HONORABLE K. MICHAEL MOORE, D.J.

## BRIEF FOR THE UNITED STATES

ANTOINETTE T. BACON
Supervisory Official

KATHERINE PAYERLE
  Deputy Chief

ANDREA SAVDIE
  Trial Attorney
  Fraud Section, Criminal Division
  U.S. Department of Justice

JEREMY R. SANDERS
  Appellate Counsel
  Fraud Section, Criminal Division
  U.S. Department of Justice
  1400 New York Ave., N.W.
  Washington, D.C. 20005
  (202) 616-2650
  jeremy.sanders@usdoj.gov

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

*United States v. Elizabeth Hernandez, No. 24-10047*

In compliance with Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1, and 11th Cir. R. 26.1-3, the undersigned hereby certifies that, in addition to the persons and entities identified in the certificate of interested persons and corporate disclosure statement contained in Defendant-Appellant Elizabeth Hernandez's Amended Opening Brief, the following have an interest in the outcome of this case:

1. Bacon, Antionette T. – Supervisory Official, Criminal Division

2. Meltzer, Ellen R. – Contractor, Criminal Division

In compliance with Fed. R. App. P. 26.1(b), the undersigned hereby certifies that the organizational victim in this case is the Centers for Medicare & Medicaid Services.

/s/ Jeremy R. Sanders
JEREMY R. SANDERS
Appellate Counsel
Criminal Division, Fraud Section
U.S. Department of Justice

C-1 of 1

# STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose Defendant-Appellant Elizabeth Hernandez's request for oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................................C-1

STATEMENT REGARDING ORAL ARGUMENT.........................................i

TABLE OF CONTENTS.............................................................ii

TABLE OF AUTHORITIES.........................................................v

JURISDICTIONAL STATEMENT....................................................1

STATEMENT OF THE ISSUES....................................................1

STATEMENT OF THE CASE......................................................2

A.    Procedural History.......................................................2

B.    Statement of Facts........................................................3

    1.    The Medicare Program.............................................3

    2.    Hernandez Fraudulently Signs Orders for DME ..........................4

    3.    Hernandez Fraudulently Signs Orders for Genetic Testing.........10

    4.    Hernandez Fraudulently Bills for Telehealth Consultations that Never Occurred.............................................15

    5.    Medicare Contractors Challenge Hernandez's Claims..................17

    6.    Hernandez and Others Profit from the Fraud............................17

C.    Standards of Review......................................................18

SUMMARY OF ARGUMENT....................................................19

ARGUMENT..................................................................21

I.     THE DISTRICT COURT APPROPRIATELY EXERCISED ITS DISCRETION IN LIMITING HERNANDEZ'S CLOSING ARGUMENT ................................................................................21

A.     Background ................................................................................21

B.     Discussion ................................................................................22

II.    THE DISTRICT COURT DID NOT COMMIT REVERSIBLE PLAIN ERROR WHEN IT INSTRUCTED THE JURY ON GOOD FAITH ................................................................................28

A.     Background ................................................................................28

B.     Discussion ................................................................................29

III.   HERNANDEZ'S FOR-CAUSE CHALLENGE TO A PROSPECTIVE JUROR IS NOT COGNIZABLE ON APPEAL ................................................................................34

A.     Background ................................................................................34

B.     Discussion ................................................................................36

     1.     Hernandez's For-Cause Challenge Is Not Cognizable on Appeal ................................................................................36

     2.     The Magistrate Judge Did Not Abuse Her Discretion in Denying Hernandez's For-Cause Challenge ................................................................................39

IV.   THE DISTRICT COURT DID NOT IMPROPERLY INTERVENE IN A DISAGREEMENT BETWEEN THE PARTIES REGARDING ADMISSION OF A PRETRIAL HEARING TRANSCRIPT ................................................................................40

A.     Background ................................................................................41

B.     Discussion ................................................................................43

     1.     The District Court Appropriately Exercised Its Broad Discretion to Conduct Trials ................................................................................43

2.      Hernandez Waived Any Challenge to the Court's Purported Failure to Comply with the Rule of Completeness and the District Court's Actions Did Not Offend the Rule ...................... 44

V.    THE DISTRICT COURT DID NOT ERR IN USING INTENDED LOSS RATHER THAN ACTUAL LOSS IN CALCULATING HERNANDEZ'S OFFENSE LEVEL ..................... 48

A.    Background ................................................................................ 48

B.    Discussion ................................................................................. 49

      1.      A Recent Amendment to Guidelines § 2B1.1 Clarified that Loss is the Greater of Actual or Intended Loss............................. 49

      2.      This Court Has Consistently Affirmed the Intended Loss Metric Under Guidelines § 2B1.1; *Kisor* and *Dupree* Did Not Abrogate that Precedent ................................................................. 52

      3.      In All Respects, the Term "Loss" Includes Intended Losses ...... 53

      4.      Any Error in Using the Intended Loss Amount Was Harmless ................................................................................. 54

CONCLUSION ................................................................................. 56

CERTIFICATE OF COMPLIANCE ................................................. 57

# TABLE OF AUTHORITIES

Cases:

*Beech Aircraft Corp.* v. *Rainey*, 488 U.S. 153 (1988) ................................................................ 46

*Blueford v. Arkansas*, 566 U.S. 599 (2012) ................................................................ 31

*Chao v. Hotel Oasis, Inc.*, 493 F.3d 26 (1st Cir. 2007) ................................................................ 43

*Herring v. New York*, 422 U.S. 853 (1975) ................................................................ 22

*Johnson v. United States*, 318 U.S. 189 (1943) ................................................................ 45

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ................................................................ 48, 51, 52, 53, 54

*Mistretta v. United States*, 488 U.S. 361 (1989) ................................................................ 54

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ................................................................ 19

*Ross v. Oklahoma*, 487 U.S. 81 (1988) ................................................................ 36, 37, 38

*Spivey v. Head*, 207 F.3d 1263 (11th Cir. 2000) ................................................................ 38, 39

*United States v. Archer*, 531 F.3d 1347 (11th Cir. 2008) ................................................................ 52

*United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) ................................................................ 48, 51

*United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011) ................................................................ 19

*United States v. Blanc*, 708 F. App'x 576 (11th Cir. 2017) ................................................................ 50

*United States v. Brannan*, 562 F.3d 1300 (11th Cir. 2009) ................................................................ 45

*United States v. Cainion*, 469 F. App'x 825 (11th Cir. 2012) ................................................................ 39

*United States v. Caldwell*, 81 F.4th 1160 (11th Cir. 2023) ................................................................ 19

*United States v. Carrodeguas*, 747 F.2d 1390 (11th Cir. 1984) ................................................................ 32-33

*United States v. Carter*, 760 F.2d 1568 (11th Cir. 1985) ......................................22-23

*United States v. Collins*, 437 F. App'x 760 (11th Cir. 2011) ................................. 38

*United States v. Davis*, 854 F.3d 1276 (11th Cir. 2017) ....................................... 40

*United States v. Dejean*, 988 F.3d 813 (5th Cir. 2021) ........................................ 40

*United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) .........................................48, 52, 53

*United States v. Flores*, 454 F.3d 149 (3d Cir. 2006) ........................................... 30

*United States v. Gaines*, 690 F.2d 849 (11th Cir. 1982)........................................ 23

*United States v. Granados*, 142 F.3d 1016 (7th Cir. 1998) .................................... 33

*United States v. Gold*, 743 F.2d 800 (11th Cir. 1984) ................................. 31-32, 33

*United States v. Goldman*, 953 F.3d 1213 (11th Cir. 2020)................................... 54

*United States v. Gray*, 105 F.3d 956 (5th Cir. 1997) ........................................... 23

*United States v. Grushko*, 50 F.4th 1 (11th Cir. 2022) .......................................... 55

*United States v. Gupta*, 463 F.3d 1182 (11th Cir. 2006) ...................................... 26

*United States v. Handlon*, 97 F.4th 829 (11th Cir. 2024) ..................................... 50

*United States v. Hansen*, 262 F.3d 1217 (11th Cir. 2001) ..................................... 32

*United States v. Harris*, 916 F.3d 948 (11th Cir. 2019) ........................................ 27

*United States v. Hill*, 99 F.4th 1289 (11th Cir. 2024) .................................19, 29, 34

*United States v. Hirst*, 668 F.2d 1180 (11th Cir. 1982)........................................ 24

*United States v. Holt*, 777 F.3d 1234 (11th Cir. 2015)......................................... 44

*United States v. Iriele*, 977 F.3d 1155 (11th Cir. 2020) ....................................... 31

*United States v. Jerchower*, 631 F.3d 1181 (11th Cir. 2011).............................. 49, 50, 51, 52

*United States v. Jernigan*, 341 F.3d 1273 (11th Cir. 2003) ................................................. 45

*United States v. Jones*, 468 F.3d 704 (10th Cir. 2006) .......................................................... 30

*United States v. Kanu*, 695 F.3d 74 (D.C. Cir. 2012) ........................................................ 43

*United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006) ................................................. 54, 55

*United States v. Lanzon*, 639 F.3d 1293 (11th Cir. 2011)...........................................46-47

*United States v. Marcelle*, 689 F. App'x 911 (11th Cir. 2017) ........................................... 22

*United States v. Martin*, 391 F.3d 949 (8th Cir. 2005)....................................................... 27

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000)..........................................37, 38, 39

*United States v. Mayol*, 710 F. App'x 849 (11th Cir. 2017)................................................ 45

*United States v. McCue*, 643 F.2d 394 (6th Cir. 1981)...................................................29-30

*United States v. Miles*, 10 F.3d 1135 (5th Cir. 1993)........................................................ 44

*United States v. Mills*, 704 F.2d 1553 (11th Cir. 1983)..................................................... 29

*United States v. Moran*, 778 F.3d 942 (11th Cir. 2015) ................................................... 52

*United States v. Moss*, 34 F.4th 1176 (11th Cir. 2022).................................................... 52

*United States v. Myers*, 972 F.2d 1566 (11th Cir. 1992)................................................... 47

*United States v. Pendas-Martinez*, 845 F.2d 938 (11th Cir. 1988) ................................... 47

*United States v. Pennue*, 770 F.3d 985 (1st Cir. 2014)................................................. 30, 33

*United States v. Phipps*, 319 F.3d 177 (5th Cir. 2003)....................................................... 29

*United States v. Presendieu*, 880 F.3d 1228 (11th Cir. 2018) ......................................... 49, 50

*United States v. Ransfer*, 749 F.3d 914 (11th Cir. 2014)..........................................18, 24

*United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021)................................................ 53

*United States v. Rodriguez*, 651 F. App'x 44 (2d Cir. 2016)...................................... 33

*United States v. Ross*, 131 F.3d 970 (11th Cir. 1997)................................................ 44

*United States v. Sanchez*, 940 F.3d 526 (11th Cir. 2019)........................................... 53

*United States v. Silvestri*, 409 F.3d 1311 (11th Cir. 2005)........................................ 45

*United States v. Simmons*, 122 F.4th 1256 (11th Cir. 2024)..................................... 43

*United States v. Stone*, 139 F.3d 833 (11th Cir. 1998)..........................................44-45

*United States v. Tegzes*, 715 F.2d 505 (11th Cir. 1983)......................................39, 40

*United States v. Thayer*, 204 F.3d 1352 (11th Cir. 2000) ......................................... 45

*United States v. Ubieta*, 630 F. App'x 964 (11th Cir. 2015)...................................... 24

*United States v. Umbach*, 708 F. App'x 533 (11th Cir. 2017)................................... 47

*United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023)........................................52-53

*United States v. Williams*, 816 F.2d 1527 (11th Cir. 1987)....................................... 44

*United States v. You*, 74 F.4th 378 (6th Cir. 2023) .................................................. 54

*Ward v. United States*, 694 F.2d 654 (11th Cir. 1983).............................................. 19

Statutes & Rules:

18 U.S.C. § 2......................................................................................................... 2

18 U.S.C. § 1035 .................................................................................................. 2

18 U.S.C. § 1347 .................................................................................................. 2

18 U.S.C. § 1349 ........................................................................ 2

18 U.S.C. § 3231 ........................................................................ 1

18 U.S.C. § 3742 ........................................................................ 1

28 U.S.C. § 1291 ........................................................................ 1

Fed. R. Crim. P. 11 .................................................................. 44

Fed. R. Crim. P. 24 .............................................................. 37, 38

Fed. R. Crim. P. 29.1 ............................................................... 24

Fed. R. Evid. 106 ........................................................... 44, 46, 47

Fed. R. Evid. 611(a) ................................................................ 43

United States Sentencing Guidelines:

U.S.S.G. § 1B1.3 ................................................................. 50, 53

U.S.S.G. § 2B1.1 ........................................... 48, 49, 50, 51, 52, 53, 54

U.S.S.G. Supp. to App. C., amend. 827 (Nov. 1, 2024) ................... 49, 51

# JURISDICTIONAL STATEMENT

Elizabeth Hernandez ("Hernandez") appeals the final judgment of conviction in this criminal case. The district court (Moore, J.), which had jurisdiction under 18 U.S.C. § 3231, entered judgment on December 22, 2023, DE.184, and Hernandez filed a timely notice of appeal, DE.192.[1] This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

# STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in limiting Hernandez's closing argument to 30 minutes.

2. Whether the district court's error in instructing the jury on good faith affected Hernandez's substantial rights sufficient to warrant reversal.

3. Whether Hernandez's argument that the magistrate judge abused her discretion in declining to strike a prospective juror for cause is cognizable on appeal.

4. Whether the district court improperly interfered in the parties' disagreement regarding admitting Hernandez's pretrial testimony.

5. Whether the district court erred in using intended loss to determine Hernandez's advisory Guidelines range.

---

[1] "DE" refers to the docket entry number. "GX" refers to the Government's trial exhibits. "Br." refers to Hernandez's opening brief.

## STATEMENT OF THE CASE

The evidence at trial established that Hernandez, an Advanced Practice Registered Nurse, participated in a massive, multi-year telemarketing conspiracy to defraud Medicare of approximately $200 million by prescribing medically unnecessary durable medical equipment ("DME") and genetic tests for thousands of Medicare beneficiaries whom she never spoke to or otherwise treated. In addition, Hernandez billed Medicare more than $1 million for telehealth consultations that she never provided.

### A. Procedural History

Following a six-day jury trial in the Southern District of Florida, Hernandez was convicted of conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Counts 2-5); and false statements relating to health care matters, in violation of 18 U.S.C. §§ 1035(a)(2) and 2 (Counts 8-10). DE.1; DE.138. She was acquitted on two health care fraud counts (Counts 6-7). *Id.* The district court sentenced Hernandez to 240 months of imprisonment; ordered her to pay restitution, jointly and severally with

her co-conspirators, in the amount of $111,261,526.00; and entered a forfeiture money judgment for $1,666,057.24. DE.184; DE.178.

### B. Statement of Facts

#### 1. The Medicare Program

Medicare is a taxpayer-funded federal health care benefit program that insures elderly and disabled individuals. DE.144:38. Medicare provides coverage for medical and other health services, including orthotic braces, other DME, laboratory tests, and physician visits. DE.144:39. A claim for DME qualifies for reimbursement only if the equipment is medically reasonable and necessary to treat an illness or injury or improve the functioning of a malformed body member, and is supported by appropriate medical documentation. DE.144:44; DE.145:121, 171. And a claim for cancer genetic testing (CGx testing), which does not diagnose cancer but can indicate a higher risk of developing certain types of cancers, qualifies for reimbursement only when a beneficiary has active cancer and the treating physician deems such testing necessary for treatment. DE.144:66-67; DE.146:183-185. A prescription signed by an authorized medical provider is necessary for DME suppliers and laboratories to bill Medicare. DE.147:63.

Medicare is a trust-based system and claims generally are paid automatically once billed. DE.144:45-46. A claim based on a kickback payment is a false claim that should not be paid. DE.144:43-44. Claims for tests or devices that are not medically necessary

3

are also false claims, as are claims supported by false information in a beneficiary's medical record. *Id.*

Hernandez was enrolled as a Medicare provider and was permitted to prescribe medications, DME, and diagnostic tests, like physicians. DE.144:156. In her Medicare application, Hernandez certified that she would comply with relevant laws and regulations, including the Anti-Kickback statute, and would not submit false or fraudulent claims for payment. DE.144:41-43; GX.120:3-4.

### 2. Hernandez Fraudulently Signs Orders for DME

In exchange for kickbacks, Hernandez entered into agreements with multiple telemarketing companies—some masquerading as telemedicine companies—to sign DME prescription orders for Medicare beneficiaries regardless of medical necessity. The companies—including Comprehensive Telecare ("CompTel"), Allure, Sunrise, SOA, Murdock Consulting, and William Frey & Associates—then sold the orders to DME suppliers, which, in turn, submitted reimbursement claims to Medicare. Each telemarketing company had a separate kickback arrangement with Hernandez. While each agreement may have had slight variations, the schemes worked in a similar fashion.

a. Hernandez signed thousands of brace orders for CompTel, a shell telemedicine company, in exchange for kickbacks. DE.145:208, 260. CompTel contracted with offshore call centers whose employees cold-called Medicare beneficiaries and offered free or low-cost orthotic braces in the mail. DE.145:202. If

4

a beneficiary agreed, the call center completed a form with basic information and placed it in CompTel's online platform. DE.145:203. Using a template, CompTel's employees—who had no medical training—assigned medical diagnoses and generated an order for braces. DE.145:203-205, 212-213. The prefilled orders were sent to Hernandez for signature through DocuSign, an online electronic-signature platform. DE.145:205-207.

To reduce the likelihood of an audit, CompTel wanted providers in the same state as the beneficiaries for whom they were signing prescriptions, DE.145:198, and Hernandez signed orders that falsely listed a Texas residency, DE.145:213; *see* DE.145:200 (CompTel owner wanted Hernandez to handle Texas because "[s]he was quick" and Texas was a high-volume state). Hernandez simply opened the orders, clicked her signature, and falsely certified that she "established a valid prescriber-patient relationship with the patient," "personally performed the assessment of the patient," and that the brace was "reasonable and medically necessary." *See, e.g.*, GX.212:3-5, 8-10 (braces order). CompTel sold the signed orders to DME suppliers for between $300 and $1000 per beneficiary, and the suppliers later billed Medicare, DE.145:191-192, 219. Hernandez was paid more than $200,000 for her signature by Barton Associates, the company that recruited her,[2] DE.145:224; GX.602.

---

[2] Some of this money compensated Hernandez for signing fraudulent prescriptions for other companies.

b.      Sunrise Medical operated in a similar fashion.  Sunrise outsourced leads for DME from other countries, including Pakistan. DE.147:37.  Sunrise's employees—who included the owner's girlfriends and young teenagers—processed the leads by using a template and fabricating beneficiary-specific information, including vital signs, complaints, pain levels, previous surgeries, diagnostic tests, and medical diagnoses. DE.147:13, 15-16, 21-24, 44.  And regardless of each beneficiary's request, employees sometimes added prescriptions for back and knee braces because those were very profitable.  DE.147:23.  Sunrise prefilled the information in DMERx, an online portal that generated DME orders,[3] and Hernandez was paid $30 for each order she signed. DE.146:138; DE.147:14-16.  Hernandez was licensed in multiple states, DE.147:11, and signed hundreds of prescriptions every week that she returned to Sunrise within 24 hours without ever speaking to the beneficiaries.  DE.144:169-170; DE.146:124, 126; *see* DE.146:126 (Sunrise's owner referred to Hernandez as a "home run doctor").

c.      Although Medicare rules prohibit a provider from allowing another person to use their identification, DE.144:78; GX.120:4, Hernandez recruited her close friend, registered nurse Joanna Ledesma, in January 2019 to help her robo-sign thousands of orders for DME and genetic testing.  DE.144:153, 155-157.  Hernandez gave Ledesma her passwords and log-in information, DE.144:159, 176, 195, taught

---

[3] Multiple companies sent Hernandez prescriptions for braces through DMERx.  *See, e.g.*, DE.148:127-128.

Ledesma how to use the online platforms to falsify Hernandez's electronic signature, DE.144:157, 273, and paid her for each signed order, DE.144:184. Hernandez instructed Ledesma to sign orders without calling beneficiaries,[4] DE.144:215-216; GX.303:1, 307:1, 312:2, and to falsify facts about beneficiaries' symptoms and injuries, *see, e.g.*, DE.144:161. For example, when prefilled DME orders omitted information about the duration of the beneficiaries' pain, Hernandez instructed Ledesma to write that the pain had been ongoing for five years. *Id.* When the orders omitted information about the cause of the beneficiaries' injuries, she instructed Ledesma to write "slip and fall." *Id.* In addition, Hernandez directed Ledesma to create bogus call logs to make it appear that Hernandez had called the beneficiaries. DE.144:160, 216, 230-231. In one text message, Hernandez instructed, "You need to place a call log … [j]ust fake it." DE.244:225; GX.305:2. And in another, Hernandez told Ledesma, "BS the time like you called them lol." DE.144:231; GX.326:2. Ledesma was not qualified to sign prescriptions. DE.144:245.

In this role, Ledesma accessed the DMERx platform from her car and signed Hernandez's name to orders, DE.144:165, and while at the movies, DE.144:167. On one occasion, Ledesma electronically signed Hernandez's name to prescriptions for braces while she was selling wreaths at a crafts show. DE.144:237-238. Hernandez

---

[4] Hernandez directed Ledesma to call beneficiaries for a few companies merely to confirm their demographics and the type of brace they wanted. DE.144:169.

separately had her boyfriend, sister, and teenage son—none of whom were medical professionals—forge her signature on doctors' orders. DE.144:223-224.

d. Hernandez signed orders for multiple braces (including lower back, knee, ankle-foot, shoulder-elbow-wrist-hand, wrist-hand, and shoulder) for most beneficiaries, regardless of need. GX.107. Claims data shows Hernandez's electronic signature on orders for one or two braces for 2,263 beneficiaries; three or four braces for 1,245 beneficiaries; five or six braces for 1,236 beneficiaries; seven or eight braces for 459 beneficiaries; nine or ten braces for 72 beneficiaries; and eleven or more braces for 21 beneficiaries. DE.144:52-53; GX.105; *see* DE.148.82 (owner of telemedicine company referring to Hernandez as a "high volume doctor[ ]").

Dr. Robert Hoover, an expert witness for the Government, reviewed multiple patient charts and orders that Hernandez signed for braces. DE.145:65. He testified that many of the medical notes were often cut and pasted from patient to patient and within each chart, DE.145:81,114, 157; incomplete, DE.145:93, 98-99, 109; and inconsistent and illogical, DE.145:86 (notes that raising arms increases patient's knee pain); DE.145:91-92 (notes that wrist braces will improve beneficiary's walking and that beneficiary's knee pain was worsened by writing). Hoover opined that none of the braces that Hernandez ordered were reasonable and medically necessary, DE.145:181-182, and that some could cause potential harm to the beneficiaries, DE.145:71-73, 89-90; *see* DE.145:82 (shoulder brace could increase patient's pain and decrease mobility).

8

The medical notes also show no physical examination of the beneficiaries occurred. DE:145:80. Although Medicare does not require a face-to-face encounter before every brace order, DE.145:130-131, even during the COVID-19 pandemic, Medicare required provider-patient interaction as a condition of reimbursement. DE.145:69, 113-114. Further, Medicare will not pay for most knee braces unless knee instability is documented by physical examination and an objective description of joint laxity. DE.144:56, DE:145:162. Nonetheless, Hernandez signed orders for 4,317 knee braces that required an in-person examination, and Medicare paid DME suppliers more than $2 million for those braces. GX.106.

Hernandez and Ledesma exchanged numerous texts boasting about how quickly they were signing orders, *see, e.g.*, DE.144:205-207 (Hernandez texts that she "is blasting through it all"), and GIFs about their financial windfalls, DE.144:235-236. In the month and a half that Hernandez worked for CompTel, she spent only seconds signing each order for DME, usually for multiple braces. DE.145:208-209; *see, e.g.,* DE.146:17; GX.203 (for 74 percent of all orders, DocuSign data shows less than fifteen seconds elapsed between Hernandez opening and signing the order); DE.145:214-216 (Hernandez added her signature to ten-page orders in six places in eleven seconds).

In April 2019, as part of Operation Brace Yourself, the Government charged multiple defendants who participated in a telemarketing and telemedicine scheme to lure Medicare patients to accept medically unnecessary DME. DE.144:58-59.

Hernandez's orders for braces then declined,[5] DE.146:15, and she turned her attention to signing false and fraudulent orders for genetic testing, DE.144:61-62.

### 3. Hernandez Fraudulently Signs Orders for Genetic Testing

a. Antonio Gousgounis recruited Hernandez to sign fraudulent cancer genetic testing orders for two call centers: Ocean Power Media ("Ocean") and Biotechnologies ("Biotech"). DE.147:152-154. The centers cold-called Medicare beneficiaries to market genetic testing, used non-medical employees to fill out cancer test requisition forms, had the forms electronically signed by Hernandez and other providers, and sold the completed forms to laboratories, which then billed Medicare. DE.147:155-158, 163. Ocean and Biotech paid Hernandez substantial kickbacks— nearly $500,000 in a five-month period—and Hernandez, in turn, paid Gousgounis 20 percent of each kickback she received. DE.147:154; DE.148:171.

Ledesma logged in to the companies' online platforms using Hernandez's passwords and signed Hernandez's name to thousands of requisition forms. DE.144:201; *see* DE.147:162-163 (Hernandez's signed about 4,500 genetic testing orders for Ocean and Biotech). But Hernandez had no prior relationship with the

---

[5] Ledesma testified that sometime after the takedown, they started signing DME orders again, but Hernandez did not change the way she did business. DE.144:163.

beneficiaries, did not consult with them,[6] and typically failed to provide them with the results of the genetic tests.[7]  DE.147:158-159, 164-165.  Nevertheless, Hernandez—and Ledesma on her behalf—falsely certified in the orders that genetic tests were medically necessary; that the "results will be used in the medical management and treatment decisions for this patient"; that she had "an on-going relationship with the patient"; that she would "use the results in the management of the patient's medical condition"; that she would "follow up with the patient once the test results are received to render additional treatment decisions"; and that she would "maintain a detailed chart … specifying how the test results impacted the medical care and treatment of the patient in follow-up visits."  *See, e.g.*, DE.144:196-197; GX.732:1 (testing order); GX.743:1 (same).

After Gousgounis was arrested in October 2020 in connection with an unrelated health care fraud case, he became concerned that Medicare would scrutinize his

---

[6] For particular companies, although Ledesma occasionally called beneficiaries before she clicked Hernandez's signature on requisition forms, she merely confirmed that the information on the form was correct and told the beneficiaries that they would receive a test kit in the mail.  DE.144:185-186.  When Ledesma was unable to reach beneficiaries, Hernandez instructed her to put the order through anyway.  DE.144:191-192.

[7] Gousgounis maintained that Biotech mailed test results to beneficiaries.  DE.147:164.  Ledesma testified that when she and others, including Hernandez's sister, called beneficiaries to provide testing results or inform them the results would be mailed, they lacked knowledge about genetics to answer any questions.  DE.144:241-243; DE.145:7.  Hernandez directed Ledesma to tell the beneficiaries to call their primary care physician if they had questions.  DE.144:242.

arrangement with Hernandez.  DE.147:166-167.  He and Hernandez then executed a sham, backdated contract to hide the true nature of their agreement.  DE.147:167, 173.  The contract falsely stated that Ocean was a "telemedicine health care and physician management organization," when in fact, Ocean was a call center.  DE.147:173.  And the contract falsely provided for Ocean to pay Hernandez a weekly flat rate, when in fact, Hernandez continued to be paid for each genetic testing order she signed until Ocean's business dried up a few months later.  DE.147:168, 175.

b.  Hernandez also signed thousands of genetic testing orders for Panda Conservation Group which owned two laboratories that performed the tests and billed Medicare.  DE.147:62, 64.  Through its so-called "Health Awareness Project," Panda advertised genetic testing on social media and interested Medicare beneficiaries completed a health and billing eligibility questionnaire.  DE.147:68, 96-98.  Panda's employees verified the information and entered a requisition form in an online platform, where providers such as Hernandez could log in and "claim" beneficiaries for whom they were supposed to conduct a consultation and approve or deny the form.  DE.144:212; DE.147:65, 69-70, 106-108.

Hernandez primarily delegated responsibility for these requisition forms to Ledesma, and again gave Ledesma her log-in and password.  DE.144:176.  She instructed Ledesma to not call any beneficiaries and instead, to input any missing

diagnosis codes, verify that the comprehensive genetic panel was selected,[8] and add Hernandez's electronic signature. DE.144:189, 288. Hernandez and Ledesma had no information about the beneficiaries beyond the form. DE.144:179; DE.147:70-71. At some point, Panda limited the number of beneficiaries a provider could "claim" to 50 beneficiaries per day. DE.147:73. But Hernandez repeatedly asked Panda's owner to lift the cap to increase the volume of orders that she and Ledesma could sign. DE.147:74; *see* DE.147:79 (Text from Hernandez: "There are 162 left in queue. I want to get them done but the system won't let me."). He always agreed, DE.147:74, and about 70 percent of Panda's orders included Hernandez's signature, DE.147:64.

Ledesma approved these orders "very fast," DE.144:172, sometimes certifying more than 180 orders in a single day, DE.145:36; *see* DE.146:21-22 (timestamps reflect two minutes or less elapsed between when most orders were assigned and signed).

c.      Dr. Anthony Magliocco, a medical expert in genetic testing for cancer, explained that Medicare provides coverage for testing for an inherited genetic mutation only for a beneficiary with an active cancer diagnosis where the results will be used to guide treatment of the beneficiary's medical condition. DE.146:178-181, 216, 249-251. Genetic tests are considered risk assessment rather than cancer screening tests and are not designed to detect disease at an early stage. DE.146:249-250.

---

[8] The comprehensive panel analyzed the largest number of genes and was billed at the highest rate. DE.144:194; DE.147:72.

Dr. Magliocco further explained that genetic tests are among the most complicated studies utilized by doctors. DE.146:182. They have significant risks, and "it is completely inappropriate" to use telemarketing and a pre-filled requisition form to prescribe this testing. DE.146:186-187, 190, 197. For the tests to have any medical value, the ordering physician must also explain the results to the beneficiary. DE.146:185. Simply mailing the results to a patient and telling them to discuss the findings with their doctor is improper. DE.146:191.

Dr. Magliocco reviewed approximately 100 CGx requisition forms and related documents that contained Hernandez's electronic signature. DE.146:199. He testified that the records failed to demonstrate a legitimate doctor-patient relationship between Hernandez and the beneficiaries, a plan for using the test results, or medical necessity for the tests. DE.146:208-217.

d. Medical professionals rarely prescribe genetic tests, DE.146:187, and despite not being an oncologist or geneticist, from 2018 to 2021, Hernandez prescribed more genetic tests for more beneficiaries than any other provider in the United States. DE.144:65-66; GX.110.

In late September 2019, law enforcement Operation Double Helix resulted in numerous charges against defendants who had billed Medicare for fraudulent cancer genetic testing. DE.144:64. At that time, Hernandez sent a nurse whom she had recruited to sign testing orders, DE.147:90, a Department of Justice press release

announcing charges against 35 individuals involved in fraudulent cancer genetic testing. DE.148:39-41; GX.445. The release disclosed that one defendant was the owner of a telemedicine company for which Hernandez had signed fraudulent orders. DE.148:42-44. Hernandez's orders for genetic tests declined for several months, but then largely resumed, and she subsequently prescribed over $100 million in genetic tests. DE.144:64-65; GX.109; GX 136.

### 4. Hernandez Fraudulently Bills for Telehealth Consultations that Never Occurred

When Medicare expanded its telemedicine coverage during the COVID-19 pandemic, DE:144:78-80, Hernandez falsely billed Medicare for consultations with beneficiaries that she never performed.

Hernandez instructed her biller to file claims primarily using a billing code designated for moderately complex, new patient telehealth consultations lasting 45 minutes or longer. DE.147:211-216. That was improper; merely clicking a signature on a pre-filled order for a genetic test—without ever seeing or speaking to the patient—is not a billable patient consultation of any length. DE.144:77, 79. And even during the pandemic, telehealth consultations required interactive audio-video technology. DE.145:112; *see* DE.148:36-37 (letter from Florida Board of Nursing instructing that "[t]elehealth does not include audio-only phone calls, e-mail messages, or fax transmissions"); DE.148:35-36 (email from telemedicine company stating that "simply

15

having a physician or medical provider review a chart and leave a voice mail for a patient … does not satisfy or create the doctor-patient relationship").

Several beneficiaries for whom Hernandez ordered cancer genetic tests testified that they never had a telehealth consultation or spoke to Hernandez, DE.146:58, 72, 85-87, and that contrary to her representations in the testing orders, she was not their treating physician and never explained the testing's nature and purpose, DE.146:60-61, 75, 90. When a beneficiary's spouse called Hernandez and confronted her about billing for a 45-minute office visit that never occurred, Hernandez replied, "You don't understand what I do … I sign forms," DE.146:38-40, and acknowledged that she was paid $38 for each signed form, DE.146:55.

Hernandez billed Medicare over $1.35 million for 7,582 outpatient office visits between February and November 2020, and was paid $734,835.07. GX.115. Hernandez's claims peaked in August 2020 during the pandemic, when she billed Medicare for 2,093 telehealth visits, averaging 67 visits each day. DE.144:78-80; GX.113. On 80 separate days during this period, Hernandez submitted claims for more than 24 hours' worth of telehealth visits. DE.144:83; GX.117; *see also* DE.144:85, 92-93; GX.117 (billing for 175 hours of work completed on June 3; 119 hours of work completed on July 23; and 109 hours of work completed on August 20).

### 5. Medicare Contractors Challenge Hernandez's Claims

Over the course of the conspiracy, Medicare contractors sent Hernandez a steady stream of complaints and requests for records. To determine medical necessity for Hernandez's telehealth visits, Medicare contractors requested certain records— including the beneficiaries' medical records and Hernandez's progress notes. *See, e.g.,* DE.147:222-223, 232-238; GX.123. Although Medicare requires providers to keep patient notes and records, GX.144:97, Hernandez was unable to furnish the requested information because she rarely interacted with the beneficiaries and did not have the requested items. DE.147:233-239; *see* DE.147:222 (email from Hernandez's medical biller telling her that Medicare needs documentation and that the requisition form alone is insufficient to justify medical necessity).

Medicare later determined that Hernandez should not have been paid on some of her claims because "services were not rendered" and requested refunds. DE.147:239-240. Hernandez did not challenge these requests. DE.147:262-268. When some beneficiaries contacted Hernandez and accused her of fraud, Hernandez refunded Medicare for those individuals, too. *See, e.g.,* DE.147:241-242. Medicare later suspended payments to Hernandez. DE.144:93-94.

### 6. Hernandez and Others Profit from the Fraud

Hernandez diligently tracked her completed orders for braces and genetic testing to ensure she received the promised kickbacks. *See, e.g.,* GX.434 (Hernandez email to

Sunrise: "I am owed 795 charts = $23,850 for 4/1 to 4/30"); GX.440 (Hernandez email to Barton stating she completed 894 charts in July 2019 but was "missing" payment for 37 charts); DE.147:171 (Hernandez text to Gousgounis saying Ocean has not paid her for 96 prescriptions). She also meticulously monitored the status of the claims she filed with Medicare for telehealth consultations that never occurred. *See, e.g.*, DE.147:220-221, 228-229.

Based on these schemes, Hernandez received over $1.66 million. DE.148:190; GX.602. Hernandez used the funds to pay off her home mortgage; take vacations; fund her brokerage accounts; and buy furniture, jewelry, and five cars, including a Corvette, Cadillac Escalade, and Mercedes Benz. DE.144:235; DE.148:177-183. She also transferred $88,531 to Ledesma. DE.148:177.

The suppliers that purchased Hernandez's signed prescriptions for braces billed Medicare approximately $14 million and were paid more than $6 million. DE.144.60; GX.107. The laboratories that purchased Hernandez's fraudulent prescriptions for genetic testing billed Medicare almost $204 million for tests for more than 14,000 beneficiaries and were paid more than $104 million. DE.144:73; GX.108.

### C.  Standards of Review

This Court reviews time limitations on closing argument for abuse of discretion. *See United States v. Ransfer*, 749 F.3d 914, 937 (11th Cir. 2014).

Because Hernandez failed to object below to the district court's good-faith instruction, this Court reviews only for plain error. *United States v. Hill*, 99 F.4th 1289, 1312 (11th Cir. 2024). Hernandez must establish error that was "clear or obvious," "affected [her] substantial rights," and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 134-135 (2018) (citation omitted).

This Court reviews a district court's decision whether to strike a prospective juror for cause for abuse of discretion. *Ward v. United States*, 694 F.2d 654, 665 (11th Cir. 1983).

Hernandez's unpreserved claim that the district court impermissibly departed from its neutral role is reviewed for plain error. *United States v. Caldwell*, 81 F.4th 1160, 1175, 1179 (11th Cir. 2023).

This Court reviews the district court's interpretation and application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th Cir. 2011).

## SUMMARY OF ARGUMENT

For her role in a brazen health care fraud that cost Medicare over a hundred million dollars, Hernandez was found guilty by a jury of numerous fraud and false statements charges. On appeal, she has failed to advance any argument that would warrant disturbing her convictions or resulting sentence. This Court should affirm.

First, the district court appropriately exercised its discretion in limiting Hernandez's closing argument to 30 minutes. The court's limitation provided defense counsel ample time to argue Hernandez's theory of the case to the jury.

Second, although the transcript reflects that the district court erred in its oral pronouncement of the good-faith instruction, because the jury received the correct instruction in written format, Hernandez cannot show that her substantial rights were sufficiently affected to warrant reversal.

Third, Hernandez cannot raise a for-cause challenge to a prospective juror on appeal because she used a preemptory strike to remove that juror and, therefore, suffered no cognizable injury.

Fourth, the district court did not improperly inject itself into a dispute between the parties regarding Hernandez's inculpatory statement, and because she stipulated to the admission of a portion of the pretrial transcript, Hernandez waived any challenge to the exclusion of the entire transcript.

Fifth, the district court properly used intended loss to calculate her advisory Guidelines range and made clear that it would have imposed the same sentence had it used Hernandez's preferred metric of actual loss.

**ARGUMENT**

## I. THE DISTRICT COURT APPROPRIATELY EXERCISED ITS DISCRETION IN LIMITING HERNANDEZ'S CLOSING ARGUMENT

Hernandez contends, Br. 30-36, that the district court abused its discretion and violated her constitutional rights when it limited her closing argument to 30 minutes and afforded the Government 40 minutes. She is incorrect.

### A. Background

On the sixth day of trial, after the defense's sole witness finished testifying, the district court discussed closing arguments. DE.149:55. The Government asked for one hour for closing and rebuttal and Hernandez requested "an hour for each day" of trial. *Id.* at 55-56. The court denied those requests and gave the Government 40 minutes and Hernandez 30 minutes. *Id.* at 57. Hernandez did not object or ask for additional time at that point. *Id.*

The Government's initial closing took 35.5 minutes. *Id.* at 104. After defense counsel argued for her allotted 30 minutes, the court stated "[y]our time is up." *Id.* at 103. Counsel twice asked for an additional 10 minutes, but the court denied the request and counsel concluded her argument. *Id.* at 103-104. The Government's rebuttal followed. *Id.* at 104-107.

Following the jury charge, *id.* at 107-127, defense counsel objected to the court's refusal to allow additional time, and for the first time objected to the disparity in time

21

assigned to the parties. *Id.* at 129. Counsel complained that Hernandez was treated unfairly and recited a number of topics she was unable to argue: "false statements, Counts 8 through 10, the amount paid, Mr. Haas, Ms. Hernandez's statements, deliberate ignorance, Joanna Ledesma, lack of evidence, patients, and good faith as a result." *Id.*

The court noted that Hernandez failed to object when it announced the format for closing arguments, that it was "too late" when counsel requested more time, and that 30 minutes was "more than ample, given the length of the trial." *Id.* The court also observed that the Government received an additional 10 minutes because "it was the Government's burden to prove [guilt]." *Id.*

## B. Discussion

The Supreme Court has recognized that in criminal cases "[t]he presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and … may ensure that argument does not … impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion." *Herring v. New York*, 422 U.S. 853, 862 (1975). This Court has similarly acknowledged that "[d]efendants and their counsel do not have a right to unlimited argument time," *United States v. Marcelle*, 689 F. App'x 911, 915 (11th Cir. 2017) (per curiam) (unpublished) (sentencing hearing), and "[t]he period of time to be allotted for attorneys' closing arguments is within the sound discretion of the district court," *United States v. Carter*,

760 F.2d 1568, 1581 (11th Cir. 1985).  In determining whether the time allotted for closing was sufficient, a court of appeals considers "whether the court's restrictions hamper[ed] the jury's ability to understand the information and issues at trial."  *United States v. Gray*, 105 F.3d 956, 963 (5th Cir. 1997).  Absent an abuse of discretion, this Court will not reverse "for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case."  *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982).

The district court did not unreasonably curtail Hernandez's closing argument. Defense counsel had full notice of the time restriction and a sufficient opportunity to present her factual and legal arguments to the jury.  Indeed, counsel pressed an array of points during closing argument: counsel discussed reasonable doubt and the Government's burden to prove intent; acknowledged that Hernandez had made mistakes but argued that she did not commit fraud; emphasized that none of the Government's witnesses had talked to her about committing fraud; argued that Hernandez took direction from the companies she worked for; asserted that before Hernandez signed orders for DME and genetic testing, she reasonably believed that the beneficiaries had been seen by another medical professional; emphasized that the beneficiaries wanted the braces and genetic tests at issue; and disputed testimony that Hernandez selected the billing code to use.  In addition, counsel attacked the credibility of the Government's cooperators.  DE.149:85-104.

Hernandez complains, Br. 31, that, given the complexity of the case, 30 minutes for defense counsel's closing argument was "outside the bounds of reasonableness." But this Court has previously rejected challenges to a district court's time limitations on summation where the defense received the same or less time than Hernandez did here. *See United States v. Ransfer*, 749 F.3d 914, 937 (11th Cir. 2014) (no abuse of discretion in limiting defense attorney's closing to 20 minutes); *United States v. Hirst*, 668 F.2d 1180, 1185 (11th Cir. 1982) (no abuse of discretion when closing argument was limited to 30 minutes); *United States v. Ubieta*, 630 F. App'x 964, 976 (11th Cir. 2015) (unpublished) (allotting two defendants 20 minutes each for closing not abuse of discretion in a trial involving "twelve witnesses, eight real estate transactions, and tens of thousands of documents").

Hernandez also claims, Br. 31-34, that the district court abused its discretion by giving the Government more time to deliver its closing. But the court's decision to permit the Government to argue for ten more minutes did not, as Hernandez suggests, Br. 32, violate her right to a fair trial and due process. Although the Government has not located appellate authority affirming a district court's decision to grant the Government more time in a single-defendant trial, it also has not located a case where a court of appeals has found unequal time to be an abuse of discretion. While perhaps unusual, the district court's decision to grant the Government 10 additional minutes was not irrational. After all, the Government was entitled to deliver both closing and rebuttal arguments, *see* Fed. R. Crim. P. 29.1, and needed to split its time between those

addresses. Moreover, as the district court pointed out, the Government had the burden of proving Hernandez's guilt beyond a reasonable doubt. DE.149:130-131.

Hernandez posits, Br. 34-35, a laundry list of topics defense counsel could not cover because of the 30-minute time limit. But as Hernandez repeatedly stresses throughout her brief, Br. 23, 30, & 37, the principal issue at trial was whether she acted with intent to defraud or, rather, acted in good faith. Although Hernandez complains that counsel was "unable to address good faith," Br. 35, and counsel admittedly never used the words "good faith," counsel did argue the substance of that defense throughout her closing. As her brief explains, Br. 35, Hernandez's good-faith defense was premised on the notion that she "relied on what she was told or understood about the companies she contracted with." *See also* Br. 35-36 (arguing that Hernandez lacked any intent to defraud "particularly because several of her supposed co-conspirators went to significant lengths to deceive her as to what they were doing [and] because contracts and records made it appear that doctors had already evaluated the patients"). Defense counsel repeatedly stressed those exact points throughout closing. *See* DE.149:85 (arguing that "these companies are appearing legitimate" and that Hernandez was "prescribing braces and tests for people that she believes wants them"); *id.* at 86 ("Not one person said they had a conversation with her about fraud."); *id.* at 87 (asking whether Hernandez "act[ed] with good intentions, despite not always doing everything she should have done?"); *id.* at 88 (noting CompTel owner's testimony that

"he made his business appear legitimate" and arguing that the companies with which Hernandez worked "don't want her to know what they were doing"); *id.* (arguing that the documents Hernandez received "look like somebody had already seen the patients"); *id.* at 90-91 (discussing Sunrise office manager's testimony that "[b]usiness was made to appear legitimate"); *id.* at 91 (arguing that the orders "were written to appear as if an examination had been held" and that others were "scamming" Hernandez); *id.* at 94 (discussing Dr. Hoover's testimony that "it appears that the evaluation was already done" and that "it looked like somebody had seen the person"); *id.* at 96 (arguing that when Hernandez reviewed the orders, "for her, it looked like th[ose] person[s] had been examined").

Of course, Hernandez mentions, Br. 34-35, other topics that counsel could have addressed with additional time, namely, her inculpatory statement, Ledesma's testimony, and purportedly exculpatory evidence from defense witness Haas.[9]  But, as Hernandez herself notes, Br. 37, "[g]ood faith was the entire issue in this case."  And on that score, Hernandez was permitted to, and did, "present the essence of [her] desired argument to the jury."  *See United States v. Simmons*, 122 F.4th 1256, 1263 (11th

---

[9]  This Court need not address Hernandez's other cited topics, namely "Counts 8 through 10," "the amount paid," "deliberate ignorance," "lack of evidence," and "patients," because she fails to explain what counsel would have argued concerning these matters.  *See United States v. Gupta*, 463 F.3d 1182, 1195 (11th Cir. 2006) ("We may decline to address an argument where a party fails to provide arguments on the merits of an issue in its initial or reply brief.").

Cir. 2024) (quoting *United States v. Harris*, 916 F.3d 948, 959 (11th Cir. 2019)).  For these reasons, and when considered alongside the substantial deference afforded to the district court's parameters for closing argument, the court here did not abuse its discretion by imposing time limitations, much less violate Hernandez's right to a fair trial and due process.

In any event, the asserted error was harmless because the jury heard overwhelming evidence of Hernandez's guilt.  The Government presented testimony from 20 witnesses, including multiple co-conspirators who pleaded guilty to similar charges.  And the Government displayed the orders for braces and genetic cancer testing with Hernandez's electronic signature; Medicare claims data for services billed by Hernandez; incriminating emails and text messages from Hernandez; a sham contract that Hernandez executed with Ocean; phone records corroborating the beneficiaries' testimony; complaints from Medicare contractors; banking records; and summary charts showing the multiple occasions where Hernandez billed Medicare for more than 24 hours of work in a single day and the brief amount of time Hernandez used to review orders and sign them.  In short, additional time for closing would not have changed the outcome of the trial.  *See United States v. Martin*, 391 F.3d 949, 957 (8th Cir. 2005) (finding any error in excluding defense argument in closing harmless because, *inter alia*, evidence of defendant's guilt was overwhelming).

## II.   THE DISTRICT COURT DID NOT COMMIT REVERSIBLE PLAIN ERROR WHEN IT INSTRUCTED THE JURY ON GOOD FAITH

Hernandez contends, Br. 36-39, for the first time on appeal that the district court erroneously instructed the jury that the defendant is required to prove good faith, thereby impermissibly shifting the burden of proof.  Hernandez is not entitled to plain-error relief because the instruction, while erroneous, did not affect her substantial rights or the fairness and integrity of the trial.

### A.   Background

When instructing the jury, the district court stated:

> Good faith is a complete defense to a charge that requires an intent to defraud.  A defendant is required to prove good faith.  The government must prove intent to defraud beyond a reasonable doubt.

DE.149:122.  No objection was made at the time.

The court provided the jury with the written instructions to use during deliberations.  *Id.* at 108.  Those instructions correctly advised the jury that "[a] defendant *isn't* required to prove good faith." (emphasis added)  DE.135:21.  In addition, both the oral and written instructions emphasized that the Government had the burden of proving intent to defraud beyond a reasonable doubt.   DE.149:122; DE.135:21.  And both forms of instructions correctly defined knowingly and willfully, DE.149:114; DE.135:11, and described the elements of the offenses, telling the jury

28

that Hernandez was guilty only if she acted knowingly and willfully and with intent to defraud, DE.149:114-122; DE.135:11-20.

## B. Discussion

The Government agrees that the district court erred in stating that "[a] defendant is required to prove good faith" and that the error was plain or obvious. Reversal is nonetheless unwarranted under the third and fourth prongs of plain-error review.

First, the district court's single error was, at most, a "slip of the tongue" that did not affect the outcome the trial. In *United States v. Hill*, 99 F.4th 1289, 1312 (11th Cir. 2024), this Court reviewed an *Allen* charge in which the district court inadvertently omitted the word "not." The defendant claimed that the erroneous jury instruction required the jury to convict and, therefore, affected his substantial rights. *Id.* Relying on *United States v. Mills*, 704 F.2d 1553, 1558 (11th Cir. 1983), where this Court held that a "single slip of the tongue" during preliminary instructions regarding the burden of proof did not prejudice the defendant, this Court determined that the defendant in *Hill* had failed to satisfy the third prong of the plain-error test. *Hill*, 99 F.4th at 1313; *see also United States v. Phipps*, 319 F.3d 177, 189-190 (5th Cir. 2003) (district court's "slip of the tongue" mention of a preponderance-of-the-evidence standard did not amount to plain error where challenged statement was isolated and general jury instructions correctly stated the law); *United States v. McCue*, 643 F.2d 394, 396 (6th Cir. 1981) (no plain error

29

where court inadvertently said "convict" instead of "acquit" in reading instruction because "[t]his one slip of the tongue by the court does not warrant reversal").

Second, the court's mistake was unlikely to have affected the verdict because as Hernandez concedes, Br. 37, the three defense attorneys "likely" "did not notice the judge departed from the standard written instruction." Nor did the two prosecutors. That five lawyers missed the deviation makes it even less likely that the jury was misled. *See United States v. Pennue*, 770 F.3d 985, 990 (1st Cir. 2014) (finding that "the instruction was unlikely to have clouded the jurors' understanding of the government's burden of proof" because "no one seems to have noticed the court's slip of the tongue at the time it happened"); *United States v. Jones*, 468 F.3d 704, 710 (10th Cir. 2006) ("The fact that defense counsel as well as the experienced district judge were unperturbed by the error, if they noticed it at all, weighs heavily" in finding the court did not commit plain error); *United States v. Flores*, 454 F.3d 149, 158 (3d Cir. 2006) (finding that "counsel's failure to object leaves us with the impression that the misstatement in the oral charge was hardly noticeable"). Indeed, although the jury sent the district court a note during its deliberations, *see* DE.149:131, it never expressed any confusion over the good-faith instruction.

Third, Hernandez's substantial rights were not affected by the erroneous oral instruction given the district court's other instructions, particularly those on intent, knowledge, and burden of proof. When assessing whether a jury instruction was plainly

30

erroneous, this Court does not "consider the asserted errors in isolation. Instead, [it] consider[s] the totality of the charge as a whole and determine[s] whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error." *United States v. Iriele*, 977 F.3d 1155 (11th Cir. 2020) (citation and quotation marks omitted). Here, the court accurately charged the jury on the meaning of intent to defraud ("'To act with intent to defraud' means to act knowingly with specific intent to use false or fraudulent pretenses, representations, or promises to cause loss or injury"), DE.149:118; advised the jury that the Government "must prove intent to defraud beyond a reasonable doubt," *id.* at 122; and recited each of the elements of the offenses, including "knowingly" and "willfully," *id.* at 114-122. In addition, the court instructed the jury that "[a]n honestly held opinion or an honestly formed belie[f] cannot be fraudulent intent, even if the opinion or belief is mistaken," *id.* at 122, and that "evidence of a mistake in judgment, an error in management, or carelessness, can't establish fraudulent intent," *id.* at 122-123. Because juries are presumed to follow their instructions, *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012), when the jury convicted Hernandez, it necessarily found beyond a reasonable doubt that she acted with fraudulent intent and the absence of good faith. *See United States v. Gold*, 743 F.2d 800, 822 (11th Cir. 1984) (statement that it was *not* necessary to find beyond a reasonable doubt that crime was committed knowingly was harmless in light of the court's

31

instructions on specific intent and the Government's burden to prove all elements of the charged crimes beyond a reasonable doubt).

Moreover, the jury was repeatedly instructed that the burden was on the Government to prove Hernandez's guilt beyond a reasonable doubt, and that Hernandez had no burden of proof. Even before the jury heard any evidence, the court underscored that "any defendant is presumed innocent until proven guilty … [T]he burden of proof is on the government until the very end of the case. The defendant has no burden to prove his or her innocence or present any evidence or to testify." DE.144:32-33. During the trial, the court reminded the jury that "[t]he burden remains with the government throughout the case." DE.146:269; *see also* DE.148:194. And at the end of trial, the court instructed the jury: "The law presumes every defendant is innocent. The defendant does not have to prove her innocence or produce any evidence at all." DE.149:108. Further, the jury was told repeatedly that the Government was required to prove Hernandez's guilt beyond a reasonable doubt, *see, e.g.*, *id.* at 108-109. Ample precedent from this Court instructs that reversal is not required in these circumstances. *See, e.g.*, *United States v. Hansen*, 262 F.3d 1217, 1250 (11th Cir. 2001) (per curiam) (where court instructed that the Government did not have to prove guilt beyond a reasonable doubt, but the other instructions on reasonable doubt were correct, the jury was not misled as to the proper reasonable doubt standard); *United States v. Carrodeguas*, 747 F.2d 1390, 1393-94 (11th Cir. 1984) (where court

32

misspoke that "it is not necessary that the defendants' guilt be proved beyond all reasonable doubt," the instructions, "when considered as a whole, did not mislead the jury as to the government's burden of proving the [defendants'] guilt beyond all reasonable doubt").

Significantly, the written instructions, which Hernandez concedes, Br. 37, were accurate, recited that "[a] defendant '*isn't*' required to prove good faith," DE.135:21 (emphasis added), and the district court provided the written instructions to the jury for use during deliberations.  As this Court has recognized, "the likelihood that [the court's] casual mistake could have had an improper effect," is reduced where the district court "permitted the jury to take a copy of the instructions (in which the error did not appear) with them when they retired to deliberate."  *Gold*, 743 F.2d at 822; *see also Pennue*, 770 F.3d at 990 ("[T]he fact that the jury received correct instructions in writing bolsters our confidence that the error complained of here was harmless."); *United States v. Granados*, 142 F.3d 1016, 1023 (7th Cir. 1998) (if the trial judge had a slip of the tongue during the oral instruction, "[t]he written instructions would have clarified any confusion the jurors may have had regarding the oral charge.").[10]

---

[10] Furthermore, the court displayed the correct written instructions on a monitor for the jury's benefit while it read the charge.  DE.149:107-108.  *See United States v. Rodriguez*, 651 F. App'x 44, 48 (2d Cir. 2016) (summary order) (unpublished) (noting that the "jury was able to follow along from the correct written instructions during the oral charge, and it had access to those written instructions during its deliberations").

Finally, as set forth *supra* at 27, the evidence against Hernandez was overwhelming. *See Hill*, 99 F.4th at 1312 (oral instructional error did not affect outcome of the trial because, inter alia, the weight of the evidence was substantial).

Taken as a whole, the oral instructions could not have misled the jury into believing that Hernandez had the burden to prove good faith, as they—and the written instructions—correctly conveyed to the jury that only the Government had the burden of proof during the entire case. Hernandez has failed to prove that the district court's unintentional misstatement was reversible plain error.

## III. HERNANDEZ'S FOR-CAUSE CHALLENGE TO A PROSPECTIVE JUROR IS NOT COGNIZABLE ON APPEAL

Hernandez argues, Br. 39-42, that the magistrate judge, in conducting jury selection, abused her discretion by declining to dismiss a juror for cause. But because Hernandez used a preemptory challenge to strike the juror in question, this claim is not cognizable on appeal. In any event, the magistrate judge did not abuse her discretion.

### A. Background

With the consent of both parties, United States Magistrate Judge Lauren Fleischer Louis presided over jury selection. DE.143:8-9. The judge conducted the initial questioning of the venire, inquiring, *inter alia*, whether any potential jurors were familiar with the case, parties, attorneys, or witnesses, *id.* at 16-17, had prior jury service, *id.* at 17-24, or "strong feelings about the medical field," *id.* at 37-49. The judge asked whether any potential jurors were "enrolled in Medicare or Medicare Advantage." *Id.*

34

at 49.  In response, Juror Mikels stated that he had recently enrolled in both Medicare and Medicare Advantage, but that he "had not used any of them yet."  *Id.* at 50.  Later, in response to additional questioning, Juror Mikels confirmed that "there [was] no reason [he] could not or should not sit as a juror."  *Id.* at 94-95.

The magistrate judge then invited the parties to ask questions.  Defense counsel questioned Juror Mikels further about his experience with Medicare.  *Id.* at 152-154.  After Juror Mikels confirmed that nothing about his experience with Medicare would "affect [his] ability to be fair," *id.* at 152-153, he disclosed that the fact that individuals who "nefariously bilk the system doesn't sit well with me," *id.* at 153.   Juror Mikels explained that, although he did not know any particulars about the case, when "people steal from the system," it "rubs [him] the wrong way."  *Id.* at 154.  When asked by defense counsel whether this was a case where he should "sit out," Juror Mikels stated that he should "[p]robably" "[s]tay out."  *Id.*

Hernandez's counsel challenged Juror Mikels for cause because "he has strong feelings regarding Medicare fraud," and "he said he should sit it out."  *Id.* at 167.  The magistrate judge denied the challenge, explaining that although Juror Mikels's "last statement" was that he should sit out, he also stated that he could be "fair and impartial" and "decide this case on this evidence."  *Id.* at 167-168.  Counsel then used a peremptory challenge to excuse Juror Mikels.  *Id.* at 168.

At a subsequent point in jury selection, after exhausting the defense's peremptory challenges, counsel for Hernandez asked for "an additional peremptory based on the Court's denial of my request for cause against Juror No. 21, Mr. Mikels." *Id.* at 172-173. The magistrate judge denied the request, stating that she was "not aware of authority that would permit [her] to grant [the defense] more peremptories." *Id.* at 174. At the conclusion of jury selection, defense counsel repeated her request for an additional peremptory challenge, which the judge again denied. *Id.* at 182-186.

## B. Discussion

### 1. Hernandez's For-Cause Challenge Is Not Cognizable on Appeal

Hernandez asserts, Br. 39, that the magistrate judge erred by denying her for-cause challenge because Juror Mikels "said he should not sit on this case due to his preconceived notions about Medicare fraud." Because Hernandez used a peremptory challenge to strike Juror Mikels, she cannot show any legally cognizable injury.

To the extent that Hernandez raises a constitutional claim concerning her right to an impartial jury, Br. 39, because Juror Mikels did not end up on the jury, her argument necessarily fails. "Any claim that the jury was not impartial … must focus not on [the removed juror], but on the jurors who ultimately sat." *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). Because "[n]one of those 12 jurors … was challenged for cause by [Hernandez], and [she] has never suggested that any of the 12 was not impartial," *id.*, Hernandez was not denied her Sixth Amendment right to an impartial jury.

36

To the extent Hernandez's constitutional claim is premised on the argument that, by using a peremptory challenge on Juror Mikels, she "had one fewer peremptory challenge than [she] would have otherwise had," Br. 40, the Supreme Court also rejected that argument in *Ross*. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross*, 487 U.S. at 88; *see also id.* at 89 (rejecting defendant's argument that his Fifth Amendment due process right was violated).

Hernandez also appears to argue, Br. 41-42, that being forced to use a peremptory challenge to remove Juror Mikels violated her "longstanding right to peremptory challenges." But *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), forecloses that argument. There, as here, the defendant received and exercised his full complement of peremptory challenges under Federal Rule of Criminal Procedure 24 but complained that "the District Court's for-cause mistake compelled [him] to challenge [a prospective juror] peremptorily, thereby reducing his allotment of peremptory challenges by one." *Id.* at 315. The Supreme Court declined to recognize this as a cognizable injury, "hold[ing] that a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *Id.* at 317.

Relying on Justice Souter's concurrence in *Martinez-Salazar*, Hernandez argues, Br. 40, that the decision in that case does not control because this Court has yet to confront a situation where the defense "show[s] that [she] would have used the peremptory challenge in question on another juror or ask[s] for a make-up peremptory challenge." She is wrong. In one of the cases Hernandez cites, *Spivey v. Head*, 207 F.3d 1263 (11th Cir. 2000), the defendant identified the juror "whom he would have otherwise peremptorily challenged" and who "ended up on the jury." *Id.* at 1274. This Court held that the Supreme Court's decision in *Ross* foreclosed the claim "that [the defendant] was forced to use his peremptory challenges to remove prospective jurors whom he alleges should have been removed for cause." *Id.*[11]

Like the defendant in *Martinez-Salazar*, Hernandez, "[a]fter objecting to the District Court's denial of [her] for-cause challenge, … had the option of letting [Juror Mikels] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal." *Martinez-Salazar*, 528 U.S. at 315. Her decision to use a peremptory challenge on Juror Mikels instead was "in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury."

---

[11] Nor does the fact that the magistrate judge denied Hernandez's request for an extra peremptory challenge change the analysis. This Court has held that a district court is not required to exercise its supervisory power to provide additional peremptory challenges beyond those guaranteed by Rule 24 when it denies a for-cause challenge. *See United States v. Collins*, 437 F. App'x 760, 762 (11th Cir. 2011) (per curiam) (unpublished).

*Id.* at 316. Having cured any injury she might otherwise have suffered from the magistrate judge's disputed ruling, Hernandez has not stated a cognizable injury under the Fifth Amendment, the Sixth Amendment, or the Federal Rules of Criminal Procedure. *See United States v. Cainion*, 469 F. App'x 825, 828 (11th Cir. 2012) (per curiam) (unpublished) ("[I]f a defendant cures a court's error in this way, he has not been deprived of any rule-based or constitutional right.").[12]

### 2. The Magistrate Judge Did Not Abuse Her Discretion in Denying Hernandez's For-Cause Challenge

Even if Hernandez's claim that Juror Mikels should have been struck from the venire was cognizable on appeal, which it is not, she has failed to demonstrate that the magistrate judge abused her discretion when she denied Hernandez's for-cause challenge. As this Court has repeatedly observed, "there are few aspects of a jury trial where [the court of appeals] would be less inclined to disturb a trial judge's exercise of discretion than in ruling on challenges for cause in empanelling of a jury." *United States v. Tegzes*, 715 F.2d 505, 509 (11th Cir. 1983). Here, the magistrate judge did not err in declining to strike Juror Mikels due to his feelings about Medicare fraud because "jurors need not be totally ignorant of the consequences of crime, nor free of opinion towards crime." *Id.* at 507. Rather, "bias or prejudice towards crime does not disqualify one to

---

[12] As was the case in *Spivey*, Hernandez only asserts, Br. 42, that the individual who sat on the jury whom she would have otherwise challenged, Juror 32, "is an undesirable juror, not a juror who should have been excused for cause." *Spivey*, 207 F.3d at 1274.

sit as a juror in a criminal case so long as those feelings do not lead to a predisposition toward the prosecution or accused." *Id.*

Moreover, as the magistrate judge correctly noted, Juror Mikels affirmed that nothing about his experience with Medicare would "affect [his] ability to be fair." DE.143:152-153, 167. *See United States v. Davis*, 854 F.3d 1276, 1297 (11th Cir. 2017) (finding no abuse of discretion in declining to strike juror for cause where juror "indicated to the judge that he would follow the court's instructions when weighing and evaluating the testimony"). Finally, the fact that Juror Mikels stated that he should probably "[s]tay out" of the case, DE.143:154, does not mean that the magistrate judge was obligated to excuse him, particularly when that answer was made in response to a leading question from defense counsel. *See United States v. Dejean*, 988 F.3d 813, 816 (5th Cir. 2021) (affirming the district court's decision not to excuse a juror who agreed with statement "that she should not sit on the jury" when district court concluded that the statement "was a response to leading questions and a result of [the juror's] desire to end the questioning").

## IV. THE DISTRICT COURT DID NOT IMPROPERLY INTERVENE IN A DISAGREEMENT BETWEEN THE PARTIES REGARDING ADMISSION OF A PRETRIAL HEARING TRANSCRIPT

Hernandez alleges, Br. 43-47, that the district court violated the principle of judicial impartiality and the rule of completeness during a dispute concerning the admissibility of a pretrial hearing transcript. The claim is meritless.

### A. Background

During a search of Hernandez's home, law enforcement seized a document in which Hernandez wrote that she "understand[s] that I have been involved in a large scale fraud"; "now know it was stupid and naïve and that I should have verified"; "I feel embarrassed and I now know that by not verifying that the documents were filled by real medical professionals and prescribing a brace is a fraud"; and "I feel responsible and feel guilty." DE.148:24-25.

Before trial, Hernandez sought to exclude the document as protected by the attorney-client privilege. DE.79. During an evidentiary hearing on this motion, Hernandez testified that her then-attorney dictated the document to her over the phone in preparation for a Government proffer session; that she (Hernandez) did not provide it to the Government because it was not true; and that she only wrote the statement because her attorney yelled at her to do so. DE.113:2-7, 13. Following the hearing, the magistrate judge ruled that the document was not privileged because Hernandez's mother and sister were present when the statement allegedly was dictated. DE.112:4.

At trial, before the Government introduced Hernandez's statement into evidence it advised the district court that it also intended to introduce, at most, a small portion of the pretrial hearing transcript to establish that Hernandez wrote the statement. DE.148:8. Defense counsel argued that the entire transcript should be introduced based on the rule of completeness. *Id.* at 9. The court sustained the Government's

objection on hearsay grounds and observed that Hernandez could testify about the statement if she wished, *id.*, but questioned how the Government would tie the statement to Hernandez, *id.* at 11. The Government cited the testimony where Hernandez conceded that she wrote the statement. *Id.* Defense counsel again asserted that the entire transcript should be introduced to provide context. *Id.* at 12.

The court asked defense counsel to identify the transcript statements she wanted in evidence. *Id.* at 13-14. Thereafter, the court encouraged the parties to stipulate that Hernandez created the document, that her attorney dictated the statement to her, and that the attorney was not current trial counsel. *Id.* After initially consenting, the Government reversed its position and asserted that the entire pretrial transcript could be admitted. *Id.* at 14. The court then suggested that the defense "is willing to meet [the Government] halfway … without getting into all the other stuff." *Id.* The Government then agreed to the stipulation, *id.* at 14-15, and defense counsel confirmed, "That's fine," *id.* at 15.

After Hernandez's written statement was admitted in evidence without objection, *id.* at 23; GX 510, the Government elicited testimony that Hernandez wrote the statement and that it was dictated to her by her attorney and then recited a stipulation that informed the jury that the attorney who dictated the statement was not Hernandez's current counsel, DE.148:26.

**B.** **Discussion**

**1.** **The District Court Appropriately Exercised Its Broad Discretion to Conduct Trials**

Hernandez's claim that the district court departed from its neutral role when it interceded in the dispute concerning the admissibility of the transcript was not raised below. Therefore, her argument is reviewed under the plain error standard, and Hernandez fails to demonstrate any error, much less plain error that affected her substantial rights or the integrity of the proceedings.

Under Federal Rule of Evidence 611, trial judges are afforded broad discretion to manage trials and regulate the presentation of evidence. *See* Fed. R. Evid. 611(a) (directing trial courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence" to, among other purposes, "avoid wasting time"); *United States v. Simmons*, 122 F.4th 1256, 1260 (11th Cir. 2024) (district court's broad discretion is necessary to ensure expeditious resolution of cases). Here, contrary to Hernandez's claim, the court appropriately intervened when it suggested that the Government agree to a stipulation, particularly when a majority of the pretrial transcript would not have provided any context to Hernandez's statement. Indeed, district courts routinely encourage stipulations as a means of promoting judicial economy and expediting trials. *United States v. Kanu*, 695 F.3d 74, 78 (D.C. Cir. 2012); *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 32 (1st Cir. 2007).

Hernandez's reliance on *United States v. Miles*, 10 F.3d 1135 (5th Cir. 1993), is misplaced because the district court in *Miles* abandoned its neutral role and participated in plea negotiations in contravention of Federal Rule of Criminal Procedure 11.  In this case, by contrast, Hernandez has failed to identify any rule the court's actions purportedly violated.  Rather than crossing the line of impartiality in favor of the Government, the court simply exercised its broad discretion in managing the trial, *United States v. Holt*, 777 F.3d 1234, 1268 (11th Cir. 2015), the admission of evidence, *United States v. Williams*, 816 F.2d 1527, 1531 (11th Cir. 1987), and the interests of judicial economy.  By facilitating the parties' stipulation, the court exercised appropriate control over the trial.

> **2.** **Hernandez Waived Any Challenge to the Court's Purported Failure to Comply with the Rule of Completeness and the District Court's Actions Did Not Offend the Rule**

Hernandez also contends that by failing to admit the entire transcript, the district court's actions contravened the rule of completeness, as set forth in Federal Rule of Evidence 106.  But even assuming the district court erred in failing to admit the transcript of Hernandez's pretrial testimony, the invited-error doctrine precludes review by this Court.  "It is a cardinal rule of appellate procedure that a party may not challenge as error a ruling or other trial proceeding invited by that party."  *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) (internal citation and quotations omitted).  A party invites error when he "induces or invites the district court into making an error."  *United*

*States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998). "The doctrine stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009); *see Johnson v. United States*, 318 U.S. 189, 200-201 (1943).

Where a defendant accepts a stipulation, this Court has consistently held that she is barred from challenging the admission or exclusion of evidence implicated by that stipulation. *See United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir. 2003) (invited error where defense counsel "affirmatively stipulated" to the admission of evidence); *United States v. Mayol*, 710 F. App'x 849, 850 (11th Cir. 2017) (unpublished) (defendant invites any alleged error by stipulating that business records were admissible); *see also United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005) (invited error where defense counsel told the court that proposed jury instructions "covered the bases"); *United States v. Thayer*, 204 F.3d 1352, 1355 (11th Cir. 2000) (per curiam) (affirmative statement by defense counsel that a course of action is acceptable precludes appellate review).

In this case, Hernandez stipulated—without reservation—to the admission of her testimony that she wrote the inculpatory statement and that her former counsel dictated the statement to her. The stipulation included the language that Hernandez requested, and she never reserved an objection under the rule of completeness. Indeed, counsel's words ("It's fine") made clear that Hernandez affirmatively accepted the stipulation. Consequently, Hernandez waived any challenge to the actions of the court.

Even if this Court excuses Hernandez's waiver, her claim would be reviewed only for plain error, and she fails to meet that exacting standard.

At the time of trial, Rule 106 provided that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."[13] Fed. R. Evid. 106. The principle underlying Rule 106 is that "[t]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." *Beech Aircraft Corp.* v. *Rainey*, 488 U.S. 153, 171 (1988) (internal citation omitted). More simply, the rule ensures "that the court [will] not be misled because portions of a statement are taken out of context." *Id.* at 171 n.14.

Hernandez asserts that her admission to writing the inculpatory statement created a misleading impression and that the exclusion of the complete pretrial transcript prevented the jury from placing Hernandez's words in context. But Rule 106 did not mandate the admission of the entire transcript. The Rule only authorizes the introduction of matters that are necessary to "qualify, explain, or place into context the portion already introduced." *United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir.

---

[13] Effective December 1, 2023, the rule was amended to specify that completing evidence can be admitted over a hearsay objection.

2011) (citation omitted).  Thus, even if the rule of completeness were applicable here, it would support admission of only the segment of the transcript that explained Hernandez's admission.  Much of Hernandez's testimony at the pretrial hearing did not provide context to that admission and, accordingly, was not admissible under this rule. *See United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988) ("Rule 106 does not automatically make [an] entire document admissible"); *United States v. Myers*, 972 F.2d 1566, 1576 (11th Cir. 1992) (defendant is not entitled "to introduce portions of his statement that are neither explanatory of nor relevant to those portions of the statement introduced by the prosecution.") (citation omitted).  Finally, Hernandez carried the burden to identify those specific portions of the transcript that added context for Rule 106 purposes.  *See United States v. Umbach*, 708 F. App'x 533, 549 (11th Cir. 2017) (unpublished).  Because Hernadez failed to do so below, she has not established a Rule 106 violation.

In the event this Court disagrees and concludes that Hernandez has established the first two prongs of the plain error standard, because of the overwhelming evidence of Hernandez's guilt separate and apart from the inculpatory statement, *see supra* at 27, she cannot show that any error on the district court's part affected her substantial rights, or that it seriously affected the fairness, integrity or public reputation of this proceeding.

## V. THE DISTRICT COURT DID NOT ERR IN USING INTENDED LOSS RATHER THAN ACTUAL LOSS IN CALCULATING HERNANDEZ'S OFFENSE LEVEL

Hernandez asserts, Br. 47-50, that the district court reversibly erred when it calculated her advisory Sentencing Guidelines range based on the intended loss to Medicare, rather than the actual loss. Citing *Kisor v. Wilkie*, 588 U.S. 558 (2019), *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc), and *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), Hernandez claims that the district erred in following this Court's prior precedent on Guidelines § 2B1.1. She asserts, Br.47-49, that the court should have considered only actual loss. The argument fails for multiple reasons.[14]

### A. Background

At sentencing, the parties agreed that the intended loss to Medicare was $192,075,966 and the actual loss was $111,261,527.[15] DE.180:5; DE.176 at ¶¶ 69-71. Hernandez objected to using intended loss, rather than actual loss, to calculate her advisory Guidelines range.[16] DE.174; DE.176-1:1.

---

[14] This issue is currently pending before this Court in *United States v. Lopez*, No. 22-13371, and *United States v. Lezcano*, No. 23-10925. Those appeals have been submitted and are awaiting decision.

[15] These amounts are slightly lower than those presented at trial because the Government removed seemingly duplicate claims from the amounts billed to and paid by Medicare.

[16] Hernandez's advisory Guidelines range was 210-262 months based on intended loss, and 168-210 months based on actual loss. *Compare* DE.176 at ¶ 154 *with* DE.174:2.

The district court overruled the objection and separately stated that its sentence "would be the same" "both with the application of the guideline provision as actual or intended," and that the sentence "would be … reasonable." DE.198:6. The court sentenced Hernandez to 240 months' incarceration. *Id.* at 36.

**B.** **Discussion**

**1.** **A Recent Amendment to Guidelines § 2B1.1 Clarified that Loss is the Greater of Actual or Intended Loss**

On November 1, 2024, the Sentencing Commission amended Guidelines § 2B1.1 and moved the "intended loss" language ("Loss is the greater of actual loss or intended loss.") from the commentary into the Guideline itself as "*Notes to Table." *See* 2024 Guidelines Manual, Supp. to App. C., amend. 827 (Nov. 1, 2024). The relevant factors, *see United States v. Jerchower*, 631 F.3d 1181, 1185 (11th Cir. 2011), indicate that this amendment is clarifying rather than substantive. The amendment therefore applies to this case and forecloses Hernandez's claim that the court should have used actual loss to determine her advisory Guidelines range. *See United States v. Presendieu*, 880 F.3d 1228, 1245 (11th Cir. 2018) ("[T]his Court applies clarifying amendments retroactively on appeal regardless of the sentencing date.").

First, the amendment's structure shows that it is clarifying. Generally, alteration of the text of a Guideline suggests substance, while alteration of the commentary suggests clarity. *Jerchower*, 631 F.3d at 1185. But here, the amendment does neither. Instead, it *moves* long-standing commentary to a "notes" section of the text. As this

49

Court explained in *Presendieu*, when the Commission moves commentary to the text, it is a clarifying change when it merely "delineate[s] more clearly" the Guideline's application. *See* 880 F.3d at 1245 (amendment limiting relevant conduct to "the scope of the criminal activity the particular defendant agreed to jointly undertake" was moved from the commentary to the text of § 1B1.3). Moreover, the amendment's characterization of the relocated language as "notes" shows that it is meant not to alter the text but to provide an explanatory supplement; a supplement to the text "further suggest[s] that the Commission's intent was to clarify." *Jerchower*, 631 F.3d at 1187 (amendment was clarifying, in part, because "the amendment [was] by way of a supplement rather than an alteration"). Further, the amendment bears no resemblance to the amendments this Court has deemed substantive. *See, e.g.*, *United States v. Handlon*, 97 F.4th 829, 833 (11th Cir. 2024) (per curiam) (amendment was substantive when it created an entirely new provision); *United States v. Blanc*, 708 F. App'x 576, 581 (11th Cir. 2017) (per curiam) (unpublished) (substantive amendment added new requirements for an enhancement's application).

Second, the Commission's description confirms that the amendment is clarifying. This Court examines whether the Commission described its amendment as clarifying or as "a substantive change in the punishment for an offense." *Jerchower*, 631 F.3d at 1185. Far from adopting a substantive change in the punishment for a § 2B1.1 offense, the Commission explained that it adopted the amendment to maintain the

status quo. The Commission's concern was that "loss calculations for individuals in the Third Circuit" were being "computed differently than elsewhere" following that court's misapplication of *Kisor* in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). *See* 2024 Guidelines Manual, Supp. to App. C., amend 827 (Nov. 1, 2024) at 267. To "ensure consistent loss calculation across circuits," the Commission "create[d] Notes to the loss table … and move[d] the general rule establishing loss as the greater of actual loss or intended loss," and the definitions of those terms, "from the commentary to the guideline itself." *Id.* at 267-268. This approach, the Commission explained, would "ensure consistent guideline application … without taking a position on how loss may be calculated in the future" if the Commission decided to "undertake a comprehensive review of § 2B1.1." *Id.* at 268. Thus, the Commission's description makes clear the amendment's clarifying nature. *Jerchower*, 631 F.3d at 1187 (explaining that although an amendment was "not specifically identified as 'clarifying' in the amendment commentary, the Commission's explanation of the reason for the amendment [made] clear its clarifying nature").

Third, the amendment aligns with this Court's precedent, further suggesting the amendment is clarifying. Typically, "an amendment overturning circuit precedent suggests a substantive change." *Jerchower*, 631 F.3d at 1185. By "circuit" precedent, this Court means its own precedent, not any circuit precedent. *See id.* at 1187 ("the amendment overturns *our* circuit's precedent" (emphasis added)). As the Commission

acknowledged, the amendment overruled only the Third Circuit. Because the amendment maintains the rule that loss is the greater of actual or intended loss, and is consistent with this Court's precedent, *see, e.g.*, *United States v. Moss*, 34 F.4th 1176, 1190 (11th Cir. 2022) ("loss is the greater of actual loss or intended loss"), it strongly suggests that it is clarifying rather than substantive. *See Jerchower*, 631 F.3d at 1185.

> **2. This Court Has Consistently Affirmed the Intended Loss Metric Under Guidelines § 2B1.1; *Kisor* and *Dupree* Did Not Abrogate that Precedent**

Even assuming the amendment is substantive and not applicable to Hernandez, her sentence should still be affirmed because this Court's precedent instructs district courts to use "intended loss" as the proper measure of loss under § 2B1.1. *See, e.g.*, *Moss*, 34 F.4th at 1190; *United States v. Moran*, 778 F.3d 942, 973-975 (11th Cir. 2015). Under the prior panel precedent rule, these decisions are binding "unless and until [they are] overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

Neither *Kisor* nor *Dupree* undermines this Court's precedent on § 2B1.1. *Kisor*, a 2019 decision that predates *Moss*, did not assess the deference due to Guidelines commentary at all, much less resolve the issue presented here: the validity of the Guidelines commentary's "loss" definition. *See United States v. Verdeza*, 69 F.4th 780, 794 (11th Cir. 2023) (observing that *Dupree* "did not 'specifically and directly'" establish

that earlier precedents holding "that 'loss' means the greater of intended or actual loss [are] wrong") (citing *United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019)).

### 3. In All Respects, the Term "Loss" Includes Intended Losses

Even if *Kisor* or *Dupree* warranted reevaluation of this Court's decisions, the result is the same. Guidelines § 2B1.1's "loss" unambiguously encompasses intended loss. Loss means "different things in different contexts." *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021). However, the "text, structure, history, and purpose" of the Guidelines reveal that § 2B1.1 includes intended loss. *See Kisor*, 588 U.S. at 589.

In particular, Guidelines § 1B1.3's definition of relevant conduct provides the necessary context to read § 2B1.1. Under § 1B1.3, sentencing courts must account for "all harm that resulted from the acts and omissions…, and *all harm that was the object of such acts and omissions*." U.S.S.G. § 1B1.3(a)(3) (emphasis added). Indeed, § 2B1.1 implements the Sentencing Commission's goal of ensuring defendants' sentences "reflect the nature and magnitude of the loss caused or intended by their crimes." U.S.S.G. § 2B1.1, cmt. (background). Reading § 2B1.1 in context of § 1B1.3 avoids sentencing disparities by recommending the same punishment for the same intent.

Even if ambiguity exists, the commentary to § 2B1.1 warrants deference under the *Kisor* framework. Under *Kisor*, this Court must defer to the Commission's interpretation where: (1) the regulation is ambiguous; (2) the interpretation reasonably falls "within the zone of ambiguity"; and (3) the character and context of the

interpretation show that it is entitled to "controlling weight." 588 U.S. at 574-576. The former commentary discussing intended loss falls within the zone of ambiguity. *United States v. You*, 74 F.4th 378, 398 (6th Cir. 2023) (finding, post-*Kisor*, district court properly considered intended loss). "Because federal theft statutes can cover a broad range of conduct with extreme variation in severity, the loss caused or intended allows courts to issue sentences that reflect defendants' relative culpability." *Id.* (quoting U.S.S.G. § 2B1.1, cmt. (background)) (internal quotations omitted). In addition, the character and context of the commentary supports *Kisor* deference, as it reflects the Commission's official position and expertise in "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders." *Id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 379 (1989)).

### 4.      Any Error in Using the Intended Loss Amount Was Harmless

Because the district court explicitly stated that it would have imposed the same sentence even if it had used actual loss to calculate Hernandez's advisory Guidelines range, any error in using the intended loss metric was harmless.

A Guidelines calculation error is harmless "when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable," under what this Court has called a "*Keene* analysis." *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020); *see United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). This framework avoids "pointless

54

reversals and unnecessary do-overs of sentence proceedings." *Keene*, 470 F.3d at 1349 (internal quotation marks omitted). Here, because the court was "aware of the dispute about the guideline application," it had the "chance to determine in the first instance that the sentence [would be] proper regardless of any error." *United States v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022).

In addition, even if the Guidelines issue had been decided in Hernandez's favor, the sentence imposed would be substantively reasonable under the alternative Guidelines range. As the court noted, this health care fraud was "more egregious than most," DE.198:26; with a loss amount that was "just staggering," *id.* at 33; requiring a sentence "that makes it unmistakably clear to individuals who might contemplate engaging in this kind of criminal behavior … that they will be facing a significant period [of] imprisonment," *id.* at 35-36.

## CONCLUSION

For these reasons, this Court should affirm the judgment.

Respectfully submitted,

ANTOINETTE T. BACON
Supervisory Official

/s/ *Jeremy R. Sanders*
JEREMY R. SANDERS
Appellate Counsel
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20530
(202) 304-7843
jeremy.sanders@usdoj.gov

KATHERINE PAYERLE
Deputy Chief

ANDREA SAVDIE
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,910 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

/s/ *Jeremy R. Sanders*
JEREMY R. SANDERS
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20530
(202) 304-7843
jeremy.sanders@usdoj.gov
